**MANOIR–ELECTROALLOYS CORP., Manoir Industries, S.A., Pompey Steel, Inc. and Manoir–Pompey, Inc., Plaintiffs,**

v.

**AMALLOY CORP., Electroalloys, Inc., Arthur A. Borin and Allen J. Underwood, Defendants/Third–Party Plaintiffs,**

v.

**Henri LACHMANN, Roger Hubert, Guy Allouchery, Carmelo Iacono and Financiere Strafor, Third–Party Defendants.**

Civ. A. No. 88–4707 (MTB).

United States District Court,
D. New Jersey.

April 20, 1989.

Carpenter, Bennett & Morrissey, P.A., Newark, N.J. by Edwin R. Alley, Coudert Brothers, New York City by Douglas F. Broder, for plaintiffs and third-party defendants Carmelo Iacono and Guy Allouchery.

Hannoch Weisman, P.A., Roseland, N.J. by Theodore Margolis, Irvin Freidlich, for defendants/third-party plaintiffs.

## OPINION

BARRY, District Judge.

Presently before the court is the motion of Coudert Brothers ("Coudert") and Carpenter, Bennett & Morrissey ("CBM"), brought on behalf of all plaintiffs and on behalf of third-party defendants Carmelo Iacono ("Iacono") and Guy Allouchery, seeking an order disqualifying the firm of Hannoch Weisman ("Hannoch") from representing the defendants/third-party plaintiffs in this matter. Because I find that Iacono was Hannoch's client at the time Hannoch filed a third-party action leveling serious charges against him on behalf of yet another client, the motion for disqualification will be granted.

## FACTS

In late 1986, Arthur Borin, President of Abex Corporation ("Abex"), was approached by representatives of Manoir–ElectroAlloys Corp. ("Manoir–ElectroAlloys"), Manoir Industries, S.A. ("Manoir Industries") and Pompey Steel, Inc. ("Pompey Steel"), regarding the sale of the assets of a foundry in Elyria, Ohio ("the Foundry"). Manoir–ElectroAlloys, Manoir Industries and Pompey Steel are all subsidiaries of, or companies related to, a French conglomerate, Financiere Strafor ("Financiere"), which owned several foundries in Europe and sought to enter the United States market.[1]

During March of 1988, Abex and a group of partners formed by Borin ("the Borin Group") completed a transaction involving the leveraged buy-out of several Abex facilities, including the Foundry, by the Borin Group.[2] Thereafter, in April of 1988, Borin traveled to France and entered into a written agreement to sell the assets of the Foundry to Financiere.

A series of detailed negotiations between Financiere and the Borin Group followed, with Financiere being represented by Coudert. The Borin Group was represented by Hannoch, the same law firm that had negotiated and concluded the leveraged buy-out between Abex and the Borin Group. A final Asset Purchase Agreement and Stockholders Agreement were entered into between the parties on October 5, 1988.

I will not engage, at this time, in a detailed analysis of the agreement reached between Financiere and the Borin Group. Suffice it to say that Manoir–ElectroAlloys, a newly-formed corporation, was to own the assets of the Foundry. Financiere, through Manoir–Pompey, Inc. ("Manoir–Pompey"), a Delaware holding company, was to own 80% of the new corporation and the Borin Group was to own the remaining 20% interest. A part of the purchase price was paid to the Borin Group at closing, with the balance to be determined based on the performance of the Foundry through February of 1989.

As President of Pompey Steel and Manoir–Pompey, Iacono was present at certain of the negotiating sessions preceding the sale of the Foundry assets and was present on July 22, 1988 at the Roseland, New Jersey offices of Hannoch along with several attorneys from both Hannoch and Coudert. At some point during that negotiat-

1. Hereinafter, with regard to the sale of the assets of the Foundry, the group of corporations collectively owned by or associated with the French conglomerate, including all plaintiffs in the current action, will, at times, be referred to as "Financiere."

2. Hereinafter, the defendants/third-party plaintiffs, Amalloy Corp., ElectroAlloys, Inc., Arthur A. Borin, and Allen J. Underwood, will be collectively referred to as "the Borin Group."

ing session, Iacono informed one of the Hannoch attorneys, Ellen Kulka, that he had a relationship with her firm. The Coudert attorneys present and Iacono contend that Iacono stated that the Hannoch firm "are my lawyers." (Collins Reply Aff. at ¶ 2; Hilboldt Reply Aff. at ¶ 2). Kulka claims that she then spoke to the Hannoch partner mentioned by Iacono, Bernard J. D'Avella, Jr. (Kulka Aff. at ¶ 4). Thereafter, and before proceeding with the negotiations, Kulka informed those present, including Iacono and the Coudert attorneys, that Hannoch had performed legal services for Iacono. Iacono and a Coudert partner, Anthony C. Kahn, stated that they had no objection to Hannoch's representation of the Borin Group. As Kahn explains, "... I shared what seemed to be the general belief at the meeting that there was not a conflict ( ... inasmuch as Mr. Iacono was not a participant in the transaction in his personal capacity and as no one informed me that Hannoch Weisman's other clients might assert claims against Mr. Iacono)...." (Kahn aff. at ¶ 4).

Hannoch's representation of Iacono had, in fact, begun in approximately 1976, when Iacono was referred to the firm by E.F. Hutton, whose personal financial management services Iacono had enlisted. Since that time, Hannoch has handled several matters for Iacono and his wife, Josephine.[3] Hannoch prepared the wills of both Mr. and Mrs. Iacono, retaining the wills at its Roseland office, and established a trust fund for their children. Additionally, it assisted Iacono with tax planning and provided him with income, estate and gift tax advice. (D'Avella Aff. at ¶ 4).

In 1983, D'Avella wrote to Iacono, informing him of recent changes in the tax laws and suggesting that Iacono contact the firm to update his will. (D'Avella Aff. at ¶ 7). According to D'Avella, Iacono never responded to that letter. Also in 1983, however, Iacono was re-negotiating his employment contract with Pompey Steel and wrote to D'Avella requesting advice as to certain provisions of the new contract.

(See August 30, 1983 letter to D'Avella, Attachment to Supplemental Iacono Aff.). Apparently, D'Avella turned the matter over to Marcus who provided the requested advice to Iacono and enlisted the aid of a New York attorney, Joseph Sierchio, to interpret the contract with regard to New York law. In a letter to Sierchio, Marcus referred to Iacono as "our client" no less than five times. (See Attachment to Supplemental Iacono Aff.). On April 3, 1984, Marcus wrote a letter to Iacono confirming the advice rendered. Iacono was billed for the services performed by Hannoch and, on May 2, 1984, Marcus wrote a letter informing Iacono that, because Sierchio's bill had not yet been paid, it had been charged to Iacono's account as an out-of-pocket disbursement. (Id.). This was the last matter for which Hannoch billed Iacono.

Iacono contends that following the July 22, 1988 negotiating session, and while at the Hannoch offices, he visited D'Avella and discussed the possibility of updating his will. (Iacono Reply Aff. at ¶ 3). D'Avella agrees that this meeting took place, and states, referring to Iacono, "I commented to him that he had never responded to my letters suggesting that he consider updating his will to take into consideration changes in the tax laws." (D'Avella Aff. at ¶ 10). According to Iacono, D'Avella "agreed that it was a good idea that his firm update [Iacono's] will...." (Iacono Reply Aff. at ¶ 3). D'Avella claims that the discussion ended without either party making a commitment to get back to the other. (D'Avella Aff. at ¶ 10).

According to plaintiffs, during the week of October 22, 1988, Arthur Anderson & Co., retained by Financiere to audit the Foundry's financials, reported to Financiere that significant inconsistent and invalid adjustments to the Foundry's income statements had been made by the Borin Group. (Hubert Dep., Vol. II at 39–40; Wiese Dep. at 26–27, 34–35, 302). These income statements, prepared by the Borin Group and delivered to Financiere with a representation as to their accuracy, had

---

3. Iacono dealt with Hannoch primarily through D'Avella, but also had contact with other Hannoch attorneys, including Stephen P. Lichtenstein and Ira B. Marcus. (Iacono Aff. at ¶ 6).

been relied upon by Financiere to project the Foundry's annual earnings. (Wiese Dep. at 207–09, 273, 306; Borin Dep. at 127–29). The projected earnings were important elements of the formula used by the parties to calculate the purchase price of the Foundry's assets. (*Id.*) As a result, plaintiffs contend that the Borin Group inflated the purchase price of the assets and, thereby, defrauded plaintiffs.

On October 28, 1988, plaintiffs, represented by Coudert and CBM, commenced the present lawsuit against the Borin Group, alleging fraud, breach of warranty and unjust enrichment. Shortly thereafter, on November 2, 1988, Theodore Margolis, a litigation partner at Hannoch, informed Edwin R. Alley of CBM that Hannoch would be representing the Borin Group in the litigation. Iacono received a copy of this letter as President of Pompey Steel, a plaintiff in the action.

On November 23, 1988, the Borin Group filed an answer and thirteen count counterclaim, charging plaintiffs with conspiracy to commit fraud, fraud, and fraud in the inducement, among other charges, in connection with the asset purchase agreement. Count One, the conspiracy count, alleges that as a result of the wrongful acts of the conspirators, the Borin Group has suffered damages "well in excess" of $5,000,000 on that count alone and seeks those damages as well as punitive damages and assorted other relief. The Borin Group also filed a third-party complaint, which named Iacono, Financiere, Henri Lachmann (President of Financiere), Roger Hubert (President of Manoir Industries) and Guy Allouchery (an employee of Manoir Industries and a Director of Manoir–ElectroAlloys) as defendants. The third-party complaint charged that "[b]y virtue of the wrongful conduct of the Third Party Defendants, as enumerated at the First Count through the Thirteenth Count of the Counterclaim", i.e. conspiracy to commit fraud, fraud, fraud in the inducement, for starters, the third party plaintiffs have been damaged and seek as against Iacono and the other third party defendants the same relief recited in the various counts of the counterclaim.

The third-party complaint was served on Iacono on December 2, 1988. Also on December 2, Hannoch sent a letter to Iacono and his wife, urging them to call Hannoch to arrange a meeting to discuss changes in the tax laws and their impact on Iacono's retirement benefits. (*See* Attachment to Iacono Reply Aff.). The letter began, "Dear Mel and Josephine," and was signed by D'Avella. It discussed the changes in the law and concluded:

> This subject must be dealt with before year end. Thus, you should accumulate the appropriate information as soon as possible so we have sufficient time to properly deal with this important matter.

*Id.*

Iacono alleges that he highlighted certain portions of the letter for the purpose of discussing those sections with D'Avella. (Iacono Reply Aff. at ¶ 3). He phoned D'Avella on December 8, 1988 to reiterate his desire to update his will. Several days later, after consulting with the firm's attorneys representing the Borin group, D'Avella told Iacono that Hannoch could not provide further services to Iacono. Accordingly, in spite of Iacono's "strong personal preference that Hannoch Weisman continue to represent me personally because I have enjoyed a long relationship of confidence and trust with them, have relied on them for advice in my personal affairs for many years, ... have confided many of the details of my personal and financial affairs to that firm" (Iacono aff. at ¶ 24), and "would have retained [the firm to represent him in defending the third party complaint] but for their newly adopted adversary position" (*Id.* at ¶ 20), on December 16, 1988, Coudert and CBM became Iacono's attorneys (Kahn aff. at ¶ 2).

Douglas F. Broder, responsible for this litigation on behalf of Coudert, first learned of the relationship between Iacono and Hannoch on February 22, 1989. The next day, while a deposition was being conducted at the Hannoch offices, Broder questioned Margolis about the potential conflict. Following the morning break, Margolis accused Broder of "reprehensible" conduct in inquiring about the mat-

ter. Margolis then stated that Iacono had waived any potential conflict at the July 1988 meeting in the presence of Coudert attorneys. Margolis also stated, apparently innocently but incorrectly, that there had been no subsequent contact between Hannoch and Iacono. (Hubert Dep., Vol II at 51).

On March 15, 1989, Coudert and CBM filed this motion, on behalf of all plaintiffs and on behalf of third-party defendants Iacono and Allouchery, seeking an order disqualifying the Hannoch firm from representing the Borin Group in this matter.[4] As noted earlier, that motion will be granted.

## DISCUSSION

The General Rules of the United States District Court for the District of New Jersey provide:

> The Rules of Professional Conduct and the Code of Judicial Conduct of the American Bar Association shall govern the conduct of the Judges and the members of the bar admitted to practice in this Court.

D.N.J. Gen.R. 6. In the past, I have read our General Rules to provide that the A.B.A. Model Rules of Professional Conduct ("Model Rules") govern, and not the Model Rules as amended by the Supreme Court of the State of New Jersey. *See Richards v. Badaracco*, 1988 WL 147152, LEXIS GenFed Dist File No. 15495 (D.N.J. 1988); *American Technologies, Inc. v. Mason Chamberlain, Inc.*, Civ. No. 85-5731, slip op. at 3 (D.N.J. Aug. 8, 1986). For purposes of this motion, however, any differences between the Model Rules and the Model Rules as amended by the Supreme Court are of no significance.

■ Coudert and CBM seek disqualification of a law firm which they allege is taking a position adverse to a present client

of that firm.[5] In such cases, the applicable Rule is Model Rule 1.7:

> Conflict of Interest: General Rule
>
> (a) A lawyer shall not represent a client if the representation of that client will be directly adverse to another client; unless:
>
> > (1) the lawyer reasonably believes the representation will not adversely affect the relationship with another client; and
> >
> > (2) each client consents after consultation.

Model Rule 1.7(a). A comment to the rule states that "a lawyer ordinarily may not act as advocate against a person the lawyer represents in some other matter, even if it is wholly unrelated." Comment 2 to Model Rule 1.7. This rule arises out of the fundamental proposition that an attorney owes a duty of undivided loyalty to his or her client. "Simply stated, it is unethical conduct for an attorney to participate in any lawsuit against his own client without the knowledge and consent of all concerned." *Ransburg Corp. v. Champion Spark Plug Co.*, 648 F.Supp. 1040, 1045 (N.D.Ill.1986). *See also Picker International, Inc. v. Varian Associates, Inc.*, 670 F.Supp. 1363 (N.D.Ohio 1987), *aff'd*, 869 F.2d 578 (Fed. Cir.1989); *Ettinger v. Cranberry Hill Corp.*, 665 F.Supp. 368 (M.D.Pa.1986). As one treatise stated: "A lawyer should not be allowed to sue an individual client on behalf of another present client, even if the lawyer represents the first client in a wholly unrelated matter, such as drafting his will." C. Hazard and W. Hodes, *The Law of Lawyering: A Handbook on the Model Rules of Professional Conduct* at p. 130 (1987 Supp.). Thus, if Iacono was Hannoch's client at the time the third-party complaint was filed against him, disqualification of the firm from representing the parties now positioned as adversaries to Iacono would almost surely follow.[6]

---

**4.** Third-party defendants Hubert, Lachmann and Financiere have not formally joined in the motion as they contest personal jurisdiction over them.

**5.** A violation of the Model Rules governing disqualification of attorneys generally result in dis-

qualification of the entire firm and not just the particular attorney involved. Model Rule 1.10.

**6.** Hannoch is correct in noting that, at least in most cases, the relevant date for determining status as a present or former client is the date on which the complaint was filed. *See Rans-*

Hannoch contends, however, that at the time the third-party complaint was filed, Iacono was, in fact, a former client of the firm. If such were the case, Model Rule 1.9, rather than Model Rule 1.7, would govern. With regard to disqualification in an action involving a former client, Model Rule 1.9(a)(1) states:

(a) A lawyer who has represented a client in a matter shall not thereafter:

(1) represent another client in the same or a substantially related matter in which that client's interests are materially adverse to the interests of the former client unless the former client consents....

A motion for disqualification pursuant to this rule involves a determination as to whether the matter in which the former representation was rendered and the current matter are "substantially related". *See, e.g., Kaminski Bros., Inc. v. Detroit Diesel Allison*, 638 F.Supp. 414, 417 (M.D. Pa.1985); *Jack Eckerd Corp. v. Dart Group Corp.*, 621 F.Supp. 725, 730 (D.Del. 1985).[7]

The threshold issue is whether Iacono was a present or a former client of the Hannoch firm in November of 1988. Hannoch argues that the last time the firm performed legal services for Iacono was in 1983–1984, when it undertook the "limited" task of issuing a legal opinion in connection with the renegotiation of Iacono's employment contract. It claims that no inference may be drawn from Hannoch's retention of the Ioconos' wills as this is standard firm practice. Moreover, it continues, it sent what it describes as "standard law firm follow-up letters" to Iacono in 1983 and in December of 1988, letters it also describes

as "form letters". Thus, according to Hannoch, when suit was instituted against Iacono by the Borin Group, he had not been a client of the law firm for over four years, and the 1988 letter was, therefore, a letter to a former client. Hannoch cannot, of course, isolate any point in time at which Iacono became a "former client" and relies solely on the fact that the last piece of business Hannoch was called upon by Iacono to handle preceded the filing of the third-party action by four years.

In support of its argument, Hannoch cites *Heathcoat v. Santa Fe International Corp.*, 532 F.Supp. 961 (E.D.Ark.1982), which it claims is directly on point. In *Heathcoat*, the plaintiff attempted to disqualify defendants' attorneys, who had prepared plaintiff's will in 1966. No further legal services had been sought by plaintiff after that time. In September of 1981, the firm sent a follow-up letter to plaintiff, addressed "Dear Friend" and signed only with the firm name, advising of recent tax law changes and suggesting that plaintiff update her will. Plaintiff forwarded the letter to her attorney in the pending action and the disqualification motion was filed.

In *Heathcoat*, the court stated:

It is clear from the record before the Court that Ms. Heathcoat was indeed a client in May 1966 at the time of the preparation and execution of her will, but that the Wright firm's representation of her ceased at that time because no further services have been sought by her since. The "Dear Friend" letter which was sent to her by the firm cannot be reasonably construed to confer upon Ms. Heathcoat the status of a present client.

---

*burg,* 648 F.Supp. at 1044. In this case, however, the most relevant date is the date on which the third-party complaint was filed. Because that event followed so shortly after the filing of plaintiffs' complaint, whether one date rather than the other is the relevant date simply makes no difference.

7. The fact that Iacono was told that Hannoch could not represent him after he called D'Avella in response to D'Avella's December 2, 1988 letter to arrange that certain legal work be done does not convert Iacono into a former client, and I do not understand Hannoch to so argue. Cer-

tainly, a firm may not circumvent Model Rule 1.7 by dropping a present client or characterizing him as a former client in order to take on a conflicting and, quite possibly, more lucrative client. Were it otherwise, both the duty of undivided loyalty to the client and public confidence in attorneys and the legal system would be undermined. *See Picker International, Inc. v. Varian Associates, Inc.,* 670 F.Supp. 1363; *Ettinger v. Cranberry Hill Corp.,* 665 F.Supp. 368; *Harte Biltmore Ltd. v. First Pennsylvania Bank,* 655 F.Supp. 419 (S.D.Fla.1987).

532 F.Supp. at 963. The court noted, in so holding, that the letter did not contain plaintiff's name on its face, and was sent merely as a courtesy by the firm. *Id.* at 963–64.

I do not agree with Hannoch that the *Heathcoat* case is "strikingly similar" to the matter before me. *See* Opposition Brief at 25. The preparation of Iacono's will was not the sole matter undertaken for him by the Hannoch firm. Rather, Iacono was referred to Hannoch by E.F. Hutton in or about 1976 and, over the years, provided legal services for Iacono whenever required and assisted him, in his individual capacity, with a number of matters. Iacono contacted D'Avella when a legal matter arose, and Hannoch provided the necessary services, enlisting the help of outside attorneys when needed and paying outstanding bills as out-of-pocket disbursements. And, according to Iacono, "They represented me personally to the exclusion of all other law firms since my initial contact with them in the 1970's" (Iacono Reply Aff. at ¶ 2).

In *International Business Machines v. Levin*, 579 F.2d 271 (3d Cir.1978), the Third Circuit observed, in disqualifying CBM from representing IBM on the basis of a present attorney-client relationship:

> Although CBM had no specific assignment from IBM on hand on the day the antitrust complaint was filed and even though CBM performed services for IBM on a fee for service basis rather than pursuant to a retainer arrangement, the pattern of repeated retainers, both before and after the filing of the complaint, supports the finding of a continuous relationship.

579 F.2d at 281.[8] Iacono's relationship with Hannoch, up to and including December of 1988, was sufficiently continuous, and the mere fortuity that he did not require more extensive or frequent services than he did cannot be the escape hatch Hannoch would have it be.[9]

Moreover, Hannoch, itself, seems to have believed that a continuous relationship existed, and, in fact, encouraged that relationship. In his 1984 letter to Sierchio, Marcus repeatedly referred to Iacono as "our client." D'Avella admits that when Iacono visited his office in July of 1988, he chastised Iacono for not having responded to the follow-up letters suggesting changes in Iacono's will, and they discussed updating Iacono's will. Not five months later, on the very day that the third-party complaint was served upon Iacono, Iacono received a letter, signed personally by D'Avella, urging "Mel and Josephine" to prepare materials and get in touch with D'Avella so that "we", quite clearly meaning the Iaconos and D'Avella, could deal with the "important matter." Certainly, it was reasonable for Iacono to construe Hannoch's actions as the actions of attorneys vis-a-vis their present client. *See Heathcoat*, 532 F.Supp. at 963. And just as Hannoch treated Iacono as if he was the firm's client, he talked to at least one member of the firm as if he was talking to his attorney.

Doubts as to whether an attorney should be disqualified are to be resolved in favor of disqualification. *Marvin Lumber & Cedar Co. v. Norton Co.*, 113 F.R.D. 588, 592 (D.Minn.1986); *INA Underwriters Ins. Co. v. Nalibotsky*, 594 F.Supp. 1199

---

**8.** CBM was disqualified under DR5–105 of the Code of Professional Responsibility which was then the controlling standard of conduct for members of the bar of this court. The Model Rules were subsequently adopted.

**9.** The cases cited by defendants/third-party plaintiffs, in addition to *Heathcoat*, in support of the proposition that an ongoing client relationship did not exist are easily distinguished. *See, e.g., Waterbury Garment Corp. v. Strata Prods.*, 554 F.Supp. 63 (S.D.N.Y.1982) (where the law firm whose disqualification was sought had earlier been dismissed by the movant and the movant had subsequently retained separate and independent counsel); *In re Palmieri,* 76

N.J. 51, 385 A.2d 856 (1978) (involving a determination of whether an attorney-client relationship could be inferred from an attorney's dealings with his business partners in a specific transaction where no bill for legal services had been submitted by the attorney); *Procanik by Procanik v. Cillo,* 226 N.J.Super. 132, 543 A.2d 985 (App.Div.), *cert. denied,* 113 N.J. 357, 550 A.2d 466 (1988) (involving a determination of whether an attorney-client relationship had ever existed between the parties based on an initial inquiry by the plaintiffs regarding whether the attorney would be willing to undertake the representation).

(E.D.Pa.1984). "If the representation is against an existing client, not just a former one, the balance shifts even more significantly toward disqualification." *Heathcoat*, 532 F.Supp. at 963 (citing *Melamed v. ITT Continental Baking Co.*, 592 F.2d 290 (6th Cir.1979); *Cinema 5 Ltd. v. Cinerama*, 528 F.2d 1384 (2d Cir.1976)).

Although the issue is not free from doubt, it is my considered opinion that on November 23, 1988, when Hannoch filed the third-party action against Iacono on behalf of its client, the Borin Group, Iacono was also a present client of the firm and, thus, there has been a breach of the well-established rule that an attorney may not represent one client in a lawsuit against another. Having determined Iacono's present client status, the conflict of interest was anything but subtle with Hannoch, on behalf of the Borin Group, accusing its client of conspiracy to commit fraud and the commission of fraud and seeking substantial damages from him. Indeed, by offering to drop Iacono as a third-party defendant, Hannoch has admitted, albeit implicitly, that its representation of the Borin Group against Iacono, while simultaneously holding itself out as being—and thought by Iacono to be—the firm representing him, created an impermissible conflict.

Pursuant to Model Rule 1.7, disqualification is appropriate based on a directly adverse relationship between two clients of an attorney or of a firm if there has not been full disclosure of the concurrent representation and the consent of both clients has not been obtained. *But see* ABA Model Rules of Professional Conduct, M.R. 1.7, Comment (Conflicts in Litigation) (permission for representation with informed client consent inapplicable to "a suit charging fraud.")

I need not reach the issue as to whether Iacono could have consented to the concurrent representation in this "suit charging fraud" because Hannoch has not met its burden of proving that a full disclosure was made and Iacono's consent obtained. *See IBM v. Levin*, 579 F.2d at 281. Hannoch contends that Iacono consented to its

representation of the Borin Group at the July 22, 1988 negotiating session. What Hannoch fails to acknowledge, however, is that at the time of the July meeting, the Borin Group had not taken a position adverse to Iacono; rather, Financiere and the Borin Group were merely engaged in negotiations for the sale of the Foundry assets. There was no hint that litigation of any kind was contemplated, let alone an action directly against Iacono, and certainly no reason for Iacono to have thought that there might be a conflict. When later he was sued personally, it was with no warning, no disclosure, no discussion, and, surely, no consent.

Neither can it be said that, subsequent to the July meeting and prior to the filing of the third-party complaint, Iacono, or attorneys from either Coudert or CBM, may be presumed to have been on notice as to the concurrent representation and, therefore, obligated to come forward if an objection existed. Constructive notice of the pertinent facts is not sufficient. *IBM v. Levin*, 579 F.2d at 281–82. Certainly, Iacono, not a lawyer, cannot be charged with the duty of recognizing the conflict involved and stating his lack of consent. Moreover, the fact that the Coudert attorneys at the July meeting were aware of Iacono's status as a client of the Hannoch firm and did not relay that information to litigation counsel who were not present because, of course, there was no litigation yet on the horizon, did not render unnecessary Hannoch's duty to have made full and effective disclosure of all the relevant facts and to have obtained an *informed* consent prior to filing the third-party action. *See IBM v. Levin*, 579 F.2d at 282 (although for more than five years, the "left hand" in IBM's legal department did not know what the "right hand" in that department was doing, the district court did not err in concluding that IBM's informed consent to the concurrent representation of it and plaintiffs had not been obtained).

■ Because the interest sought to be protected by Model Rule 1.7 is one of loyalty, a *per se* rule of disqualification should be applied when that rule is breached. Dis-

qualification will not only protect the present client but will have the salutory effect of promoting public confidence in the integrity of the bar and the judicial system. As the Third Circuit observed, "The maintenance of public confidence in the propriety of the conduct of those associated with the administration of justice is so important a consideration that we have held that a court may disqualify an attorney for failing to avoid even the appearance of impropriety [citations omitted]." *IBM v. Levin*, 579 F.2d at 283. And where, as here, a firm has taken a position on behalf of one client which is directly contrary to that of another client, going so far as to call latter client a conspirator, the *per se* disqualification rule is not only applicable, but mandated.

One final observation must be made. As noted earlier, in hopes of staving off disqualification, Hannoch offered to drop the third-party action against Iacono, an offer which Coudert and CBM, on behalf of their clients—including Iacono—rejected. Hannoch's offer illustrates why the *per se* rule of disqualification is wholly appropriate. It is clear that the charges leveled by the Borin Group will have an "adverse effect" on Iacono—president of two of the four plaintiffs/counterclaim defendants and alleged to have conspired with every party adverse to the Borin Group—whether or not he is directly named in the action. More importantly, however, assuming that the charges the subject of the third-party action were brought in good faith, the only reason to offer to drop those charges, thereby apportioning loyalty between two clients, is to keep Hannoch in the case. Such a compromise does not foster confidence in the integrity of the bar.

I have no reason to believe that those Hannoch attorneys responsible for this litigation have acquired any confidential information much less any such information useful in the litigation of this case from Iacono, from his files, or from those attorneys who rendered services to him, and I accept the representation that any such information otherwise in the firm's possession will remain confidential. I will, therefore, permit Hannoch to 1) discuss this case, which is still in its early stages, with potential substitute counsel; 2) turn over to substitute counsel, within thirty days after substitute counsel has been retained, Hannoch's work product on the case; and 3) confer with substitute counsel for a period of sixty days after retention.

The court will issue an appropriate order.

### ORDER

This matter being opened to the court on motion of plaintiffs and third-party defendants Carmelo Iacono and Guy Allouchery, by their attorneys Carpenter, Bennett & Morrissey, P.A., Edwin R. Alley, Esquire appearing, and Coudert Brothers, Douglas F. Broder, Esquire appearing, respectively, to disqualify Hannoch Weisman from this action as counsel for defendants/third-party plaintiffs, and the court having heard oral argument and in consideration of the papers submitted; and

For the reasons expressed in this court's opinion dated April 20th, 1989,

It is on this 20th day of April, 1989

ORDERED that the motion to disqualify Hannoch Weisman is hereby granted; and it is further

ORDERED that Hannoch Weisman will be permitted to:

1) discuss this case, which is still in its early stages, with potential substitute counsel;

2) turn over to substitute counsel, within thirty days after substitute counsel has been retained, Hannoch's work product on the case; and

3) confer with substitute counsel for a period of sixty days after retention.