CHAPMAN ENGINEERS,
INC., Plaintiff,

v.

NATURAL GAS SALES CO.,
INC., Defendant.

NATURAL GAS SALES CO.,
INC., Plaintiff,

v.

MID–AMERICA PROCESSING, INC., et
al., Defendants.

NATURAL GAS SALES CO.,
INC., Plaintiff,

v.

William KRAUSE, et al., Defendants.

MID–AMERICA PROCESSING, INC.,
et al., Plaintiff,

v.

ENRON GAS PROCESSING
COMPANY, et al.,
Defendant.

Nos. 87–1141–C, 87–1546–C, 87–1641–C
and 87–1727–C.

United States District Court,
D. Kansas.

May 21, 1991.

Glen R. Winters, Stillwater, Okl., Gary W. Gardenhire, Norman, Okl., Kenneth H. Jack, Bruce & Davis, Wichita, Kan., for plaintiff Mid–America Processing, Inc.

Stephen W. Jacobson, Bryan, Cave, McPheeters & McRoberts, Kansas City, Mo., and Donald W. Bostwick, Adams, Jones, Robertson & Malone, Wichita, Kan., for defendant Union Carbide Corp.

Joseph W. Kennedy, Dennis M. Feeney, C. Michael Lennen, Morris, Laing, Evans, Brock & Kennedy, Chtd., Wichita, Kan., and Charles E. Cheek, Houston, Tex., for Enron Gas Processing Co.

## MEMORANDUM AND ORDER

CROW, District Judge.

The case comes before the court on the motion of Enron Gas Processing Company ("Enron") to disqualify Stanley M. Ward ("Ward") as counsel for Mid–America Processing, Inc. ("MAP"), Mid–America Contractors, Inc. ("MACI"), and Jimmy G. Hall. On the court's notice, the motion was argued and the evidence presented on February 25, 1991. Having now reviewed the parties' additional briefs, the court issues this order as its findings of facts and conclusions of law on the motion as required by *Fullmer v. Harper*, 517 F.2d 20, 21–22 (10th Cir.1975).

In its motion, Enron argues Ward was closely involved in the events leading up to this litigation as both a negotiator and drafter of critical documents. Disqualification of Ward is sought primarily on the following two grounds: (1) In a different, but related proceeding, he represents another client whose interest may be adverse to his client in this case; and (2) He will be a necessary witness on behalf of Enron. The motion is opposed on both grounds.

Because these cases involve multiple dealings and contracts between numerous parties over a period of several years, the stage for this motion must be set before the findings and conclusions can be made. These events are gleaned from the parties' briefs on this motion and other pleadings of record. In August of 1984, Mid-America Processing, Inc. ("MAP"), Natural Gas Sales Company, Inc. ("NGS"), a subsidiary of Sunflower Electric Cooperative, Inc. ("Sunflower") and Chapman Engineers, Inc. ("CEI") entered into a joint venture for the construction and operation of the Sand Hills Gas Plant ("Plant"). When finished, the Plant was to have the capacity to extract and process natural gas liquids for sale. Most of the responsibility for constructing the Plant was given to CEI, and the Plant's operation was left to MAP. Needing additional capital, the joint venturers made certain arrangements. MAP transferred all or most of its ownership in the Plant facilities to CEI. CEI then secured a loan from Union Carbide Corporation ("UCC") in an amount exceeding $6,000,000 and placed as security its interest in the Plant facilities.

In December of 1985, UCC declared CEI to be in default under the loan agreement. The Plant was not yet fully operational, as certain construction had not been completed and supplies of gas were inadequate. On February 14, 1986, UCC and CEI entered into a settlement agreement whereby UCC was transferred all of CEI's interests and title to the Plant and assumed many of the obligations associated with the joint venture.

In January of 1986, the Sand Hill joint venturers, including UCC, engaged in negotiations with third parties to bring about either the sale of their individual interests or other arrangements for the Plant's operation. It was during this period that Northern Gas Products, now Enron, was approached about the Plant.

The most important negotiations were occurring between UCC and Mitsui U.S.A., Inc. ("Mitsui") over the lease or sale of UCC's interest in the Plant. At some point, Mitsui conditioned its acquisition of the Plant upon the removal of MAP and Jimmy G. Hall from the project. UCC and NGS then later voted on February 19, 1986, to remove MAP as operator of the Plant.

Ward attended the February 6, 1986, meeting of the Sand Hills Operating Committee on behalf of MAP. Ward has testified in his deposition to his impressions and observations from that meeting.

In June of 1986, MAP received notice from the other joint venturers of their desire to sell, assign or convey their interests in the Plant to Mitsui. This notice was given in compliance with their joint venture agreement which required a joint venturer to offer the sale of its interest first to another joint venturer.

In an effort to exercise its right of first refusal, MAP met with Enron and Golden Arrow Gas Energy Corp. ("GAGE") in July of 1986 to discuss the acquisition of the Plant by lease or purchase. Ward participated in that meeting as a representative of GAGE. One of the primary issues in this case is whether Enron forced itself into this project with threats or whether MAP elected to have Enron involved as an equity participant. MAP informed UCC, Sunflower and NGS, by letter dated July 17, 1986, that it intended to exercise its right of first refusal and meet the terms of the Mitsui offer.

In August of 1986, MAP conditionally assigned its interest in the Plant, including its option to purchase, to Enron and GAGE which gave them the temporary right to negotiate with all parties for the purchase of the Plant. A condition to the assignment was Enron's and GAGE's successful negotiation of contracts with all parties. Mitsui's offer expired on September 18, 1986, while negotiations between Enron, GAGE and the other parties continued. On October 30, 1986, a second temporary assignment was executed which contemplated that Enron would operate the Plant and own one-half of the Plant with GAGE owning the other half.

By its written terms, the second temporary assignment expired at the end of 1986. Negotiations by Enron and GAGE failed to yield a working relationship. Ward, as

counsel for GAGE, drafted a construction and operation agreement which set forth the terms of the proposed business arrangement between Enron and GAGE. This agreement was never executed.

Ward also drafted on or about February 10, 1987, a proposed letter of intent between Enron and the Bradshaw gas producers. Enron considers this letter to be important evidence of its position that dedicated long-term supplies of gas were a condition to their negotiations. Despite their efforts, the parties' negotiations came to a standstill and litigation was pursued.

## FINDINGS OF FACT

1. Ward first became aware and involved in matters regarding the Plant in 1985. A close personal friend of Ward represented MAP and Hall in the project at the time. His friend was undergoing some personal problems and Ward was helping his friend maintain his legal practice. Ward was also at that time serving as general counsel to the University of Oklahoma and carrying on a part-time practice which included the representation of GAGE, a gas gathering and transmission company based in Oklahoma. In an effort to assist his friend, Ward attended a meeting in February of 1986 between the Plant's joint venturers. Ward may have also assisted his attorney-friend in drafting and reviewing correspondence. Ward's representation of MAP and Hall was limited to this meeting and general advice to his friend prior to his entry of appearance in this case on behalf of MAP and Hall.

2. Sometime in March or April of 1986, negotiations between GAGE and MAP began in regards to GAGE supplying the capital for MAP's acquisition of the Plant. Ward may have been consulted during this time by GAGE about this possible transaction.

3. Ward first met with representatives from Enron about the Plant on July 2, 1986. Hall announced at the meeting that he was bringing Enron into the project to acquire the Plant. Ward recalls that Enron represented at the meeting that if it were not involved in the acquisition and did not handle all negotiations then no gas would flow from the Plant. Ward reviewed on behalf of GAGE the temporary or first assignment and agreement of August 1986 and the permanent or second assignment and agreement of October 1986. Ward also later negotiated with Enron representatives over the terms of the proposed maintenance and operating agreement and assisted in drafting this proposed agreement.

4. Ward testified that he understands the assignment and agreement placed the obligation equally on Enron and GAGE to pay the $400,000, to MAP as consideration for MAP's assignment of the right of first refusal.

5. In February of 1987, Ward met with representatives of Enron to determine why the deal, in particular the operating and maintenance construction agreement, had not been finalized as expected in December of 1986. In response to concerns about sufficient gas commitments for production voiced by Enron at this meeting, Ward prepared and mailed to Enron a proposed letter of intent to be sent to Bradshaw producers on behalf of Enron. [Enron contends that certain language in that proposed letter of intent is critical to its defense that conditions existed to their agreement with MAP which had not been and never were met.]

6. In 1987, MAP filed claims against the other joint venturers, UCC and Sunflower/NGS for breach of the Sand Hills Joint Venture Agreement. MAP brought suit against Enron for not successfully negotiating the purchase of the Plant. Enron filed a third-party complaint against GAGE for indemnity and contribution, and GAGE, in turn, filed a counterclaim against Enron. In May of 1989, Enron settled with GAGE under the terms of a confidential agreement. Ward represented GAGE in the litigation and settlement.

7. Ward explained in a two or three-hour meeting between himself, Hall and Hall's two other attorneys, Winters and Gardenhire, the potential ethical problems with his representation of Hall. Hall was aware of Ward's involvement in the project during his brief representation of MAP and

his later representation of GAGE. Ward fully disclosed to Hall the chances he would be called as a witness in the case emphasizing that he had represented GAGE for the more than two years in which it had been in this litigation before settling with Enron and that no attempt had been made to take his deposition and no motions to disqualify him had been filed. Ward likewise discussed the potential conflicts with the principals of GAGE, and Ronald Miller of GAGE and Hall even discussed any problems with Ward's representation. Hall expressed to Miller that he had no intention of suing GAGE about anything connected with the Plant as he believed that GAGE had acted in good faith throughout and that Enron was principally responsible for the failed deal.

8. Ward entered his appearance on behalf of MAP in March of 1990. Shortly thereafter, UCC filed a separate lawsuit against GAGE, alleging that GAGE breached the contract to purchase UCC's interest in the Plant. UCC further claims GAGE is vicariously liable for any wrongdoing of Enron, as a joint venturer. Ward represents GAGE in that lawsuit pending in Judge Theis' court. Ward testified that he sees no conflict that should prevent his representation of Hall and MAP in this court and his representation of GAGE in Judge Theis' court.

9. Ronald Miller with GAGE telephoned UCC's attorney and asked why this new lawsuit was filed against GAGE. The attorney responded in part that they believed GAGE was giving financial support to Hall to continue his litigation in this court.

10. When Hall and his entities filed their suit in 1987, they were represented by Robert Pezold, Mary B. Lewis and W. Keith Thomas. Hall and MAP were unable to pay for the services of Pezold and Lewis and they withdrew from the case on June 14, 1988. Thomas withdrew from the case for other reasons on April 11, 1989, and Winters entered his appearance on the same day. When Winters agreed to represent him, Hall understood that they would obtain additional counsel who had the trial experience to handle a case of this size.

Winters and Hall contacted several attorneys including Ward who said he did not have the time to devote to this case but referred him to another attorney. Hall returned to Ward and again asked for his legal services in this case. Ward called another attorney, Mr. Gardenhire, and asked him to attend the meeting with Hall. After several meetings, Ward agreed to represent Hall and his entities, and Gardenhire agreed to assist Ward only on certain aspects of the litigation, in particular the damages issues, as his practice would not permit him the time to assume the role of lead counsel. Winters, Ward and Gardenhire represent Hall on a contingency basis, as Hall and his entities are in poor financial condition.

11. At the hearing, counsel for Hall and his entities announced that claims and allegations of a joint venture between Enron, GAGE and MAP were abandoned.

## CONCLUSIONS OF LAW

1. By virtue of D.Kan.Rule 407(a) and Kan.S.Ct.Rule 226, the Model Rules of Professional Conduct ("Model Rules") set forth the "standards of conduct and practice of the legal profession in Kansas." *Graham v. Wyeth Laboratories*, 906 F.2d 1419, 1421 (10th Cir.1990). The parties agree the Model Rules govern the issues in this motion.

2. The court generally supervises counsels' conduct in litigation before it, and decisions to disqualify counsel are committed to the court's sound discretion. *E.E. O.C. v. Orson H. Gygi Co., Inc.*, 749 F.2d 620, 621 (10th Cir.1984). At the same time, courts do not exist to discipline attorneys, but to resolve disputes. *Papanicolaou v. Chase Manhattan Bank, N.A.*, 720 F.Supp. 1080, 1082 (S.D.N.Y.1989). The movant has the burden of showing sufficient grounds for disqualification. *F.D.I.C. v. Sierra Resources, Inc.*, 682 F.Supp. 1167, 1170 (D.Colo.1987). The courts in this district approach motions to disqualify conscientiously and conservatively:

> Disqualification of an attorney chosen by a party to represent him in a lawsuit is a serious matter. Courts have the

inherent power to disqualify counsel where necessary to preserve the integrity of the adversary process.... However, each case must be decided on its own peculiar facts. *United States v. Standard Oil Co.,* 136 F.Supp. 345 (S.D. N.Y.1955).

The immediate preventive measure sought by plaintiff is indicated only where the offending attorney's conduct threatens to "taint the underlying trial" with a serious ethical violation. *W.T. Grant Co. v. Haines,* 531 F.2d 671 (2nd Cir.1976). There are, in this Court, in the state of Kansas, and in every other state, detailed and pervasive rules and enforcement machinery to deal with ethical violations.

*Ramsay v. Boeing Welfare Ben. Plans Committee,* 662 F.Supp. 968, 969–70 (D.Kan.1987) (quoting *Field v. Freedman,* 527 F.Supp. 935, 940 (D.Kan.1981)). Motions to disqualify "should be reviewed with extreme caution for they can be misused as a techniques of harassment." *Panduit Corp. v. All States Plastic Mfg. Co.,* 744 F.2d 1564, 1577 (Fed.Cir.1984).

▆ 3. An ethical violation does not automatically trigger disqualification. *Papanicolaou,* 720 F.Supp. at 1083. The remedy for unethical conduct lies with the appropriate disciplinary machinery unless there exists the threat of tainting the trial. *Ramsay,* 662 F.Supp. at 970. The right to be represented by counsel of choice is an important one, subject to override only upon a showing of compelling circumstances. *Id.* See also *Panduit,* 744 F.2d at 1577 (A court must maintain "the delicate balance" between the need to uphold ethical standards and an individuals's right to counsel of his choice).

## CONFLICT OF INTEREST

4. Enron contends that Ward's concurrent representation of MAP and GAGE violates Model Rule 1.7, which reads:

(a) A lawyer shall not represent a client if the representation of that client will be directly adverse to another client, unless:

(1) the lawyer reasonably believes the representation will not adversely af-

fect the relationship with the other client; and

(2) each client consents after consultation.

As stated in its comments, this rule is premised on the notion that loyalty is "an essential element" to a lawyer-client relationship. Model Rule 1.7 comment. The attorney owes his client "undivided loyalty" in his role as "advocate and champion." *Cinema 5 Ltd. v. Cinerama, Inc.,* 528 F.2d 1384, 1386 (2nd Cir.1976). Subsection (a) of Rule 1.7 addresses conflicts in interests that are directly adverse and concurrently represented. It forecloses an attorney from representing two clients who have directly adverse interests unless the attorney reasonably believes the representation will not harm his relationship with either client and both clients consent to his concurrent representation. The terms of Rule 1.7(a) present at least three questions of construction that also necessarily affect the application of the Rule. When is the representation of one client "directly adverse" to another client? What constitutes a reasonable belief by the attorney? When will the conflict in representation "adversely affect the relationship" between the attorney and his other client? Before these questions are addressed, a threshold issue must be resolved.

### A. Standing

▆ 5. MAP challenges the standing of Enron to bring a motion to disqualify on this ground. The conflict of interest rules were intended "to encourage communication between the client and attorney" and developed "to protect the former client." *Cox v. American Cast Iron Pipe Co.,* 847 F.2d 725, 728, 729 (11th Cir.1988). Consequently, it is the general rule that the " 'courts do not disqualify an attorney on the grounds of conflict of interest unless the former client moves for disqualification.' " *Federal Deposit Ins. Corp. v. Frazier,* 637 F.Supp. 77, 79 (D.Kan.1986) (Chief Judge O'Connor) (quoting *Beck v. Board of Regents of the State of Kansas,* 568 F.Supp. 1107, 1110 (D.Kan.1983) (Judge Saffels)); see also *Monarch Normandy Square Partners v. Normandy Square As-*

sociates Limited Partnership, *No. 88–1338-C, 1989 WL 86963 (D.Kan. July 26, 1989)*. In Beck, *Judge Saffels espoused an exception to the general rule:*

> An exception exists, however, where the interests of the public are so greatly implicated that third parties, such as the defendants in this motion, are found to be entitled to raise any apparent conflicts of interest which may tend to undermine the validity of the proceedings.
>
> Whenever the actions of a member of the bar may in the eyes of the public cast even the appearance of an impropriety upon the legal profession, there exists an ethical duty upon each member of the bar and upon the court itself to examine the conduct and determine if a breach of professional ethic has occurred or is about to occur.

568 F.Supp. at 1110; see also *Frazier,* 637 F.Supp. at 79–80 (exception invoked where law partners of defendant's counsel had potential adverse interest with defendant), and *Monarch Normandy, supra* (No standing found as the alleged conflicts did not threaten to taint or undermine the integrity of the proceedings).[1] The Comments to the Model Rule 1.7, adopted in Kansas, further provide:

> Where the conflict is such as clearly to call in question the fair or efficient administration of justice, opposing counsel may properly raise the question. Such an objection should be viewed with caution, however, for it can be misused as a technique of harassment.

In this case, the court finds that the exception applies as the movant has clearly shown a potential conflict of interest that greatly implicates public interest and threatens the fairness of the trial.

### B. Substantive Violation

6. Enron contends Ward cannot simultaneously represent the interest of MAP in this case and GAGE in the separate, but related, case brought by UCC that is pending before Judge Theis. In particular, Enron argues that GAGE has denied in the other case any joint venture relationship between it, Enron, and MAP. Enron claims this position is adverse to MAP's claims and allegations against Enron based upon a joint venture. Next, Enron argues that GAGE is jointly liable with it for the $400,000 payment to MAP for assignment of the first right of refusal. Enron claims this position is adverse to MAP's claim against Enron to recover the full $400,000. Enron also argues there is a potential for adverse interests in any settlement negotiations conducted in these related cases. Finally, Enron contends there is a potential that the terms of the confidential settlement agreement between Enron and GAGE may create a situation of adverse interests between MAP and GAGE. In sum, Enron contends the interests of GAGE and MAP are so adverse as to preclude Ward from reasonably believing he can represent both clients without adversely affecting his relationship with either one.

7. Corresponding to some degree with the three questions identified above, Rule 1.7(a) can be broken down into three elements: (1) adversity of interests; (2) adequacy of representation; and (3) consent of both clients. The court will discuss each element and the corresponding question *seriatim.*

---

1. The circuits are divided over the issue of standing to raise a conflict of interest challenge. The Fifth Circuit has held that only a former client may move for disqualification on this ground subject to narrow exceptions as (1) the movant being a corporation which the former client controlled; (2) the unethical conflict of interest is "manifest and glaring" and "open and obvious" such that the court plainly had the duty to act; and (3) the former client appeared to join in the motion. *In re Yarn Processing Patent Validity Litigation,* 530 F.2d 83, 89 (5th Cir.1976). Some circuits have followed this general rule. *Dow Chemical Pacific Ltd. v. Ras-* *cator Maritime, S.A.,* 782 F.2d 329, 341 (2nd Cir.1986); *Dana Corp. v. Blue Cross & Blue Shield,* 900 F.2d 882, 889 (6th Cir.1990). Other circuits have recognized that an opposing counsel has standing to move for disqualification based upon his or her ethical duty to report ethical violations. *Kevlik v. Goldstein,* 724 F.2d 844, 848 (1st Cir.1984). The approach taken in Kansas is that followed by the Fifth Circuit with some modification to the second exception. Instead of "manifest and glaring" and "open and obvious" conflicts of interest, Kansas courts find standing if the public interest is "so greatly implicated."

■ 8. To trigger Rule 1.7(a), the attorney's representation of one client must be "directly adverse" to the interests of another client. The use of "directly" to modify adverse suggests that interests of clients that are only indirectly or generally adverse does not come within the scope of Rule 1.7(a). 1 G. Hazard, Jr. and W. Hodes, The Law of Lawyering § 1.7:203 (1990). Adversarial roles in litigation plainly fall within the intended scope of "directly adverse" interests. Model Rule 1.7(a) comment. Another aspect to this issue is that Rule 1.7(a) operates only when the interests "will be directly adverse." Such language rules out the mere possibility of "directly adverse" interests and inserts another factor of reasonable probability in the determination. The Law of Lawyering § 1.7:203 at 233.

9. Enron confines its arguments on the application of Rule 1.7(a) to MAP and GAGE having directly adverse interests only as to the matters being presently litigated in this court and in Judge Theis' court. Based upon the testimony of Hall on behalf of MAP and Miller on behalf of GAGE, it is apparent they do not see any adverse interests between themselves and, in particular, any differences which should be the subject of litigation. Hall said he had no intention of suing GAGE on any matters involving the Plant. Indeed, Hall and his entities never chose to sue GAGE nor did GAGE sue MAP during the three years that this case was pending before Ward entered his appearance for MAP. Their inconsistent positions on certain facts or legal characterizations have been essentially eliminated by MAP narrowing the scope and number of claims against Enron. The likelihood of a conflict in positions during settlement negotiations is nothing more than speculation over possibilities. The court also finds no reasonable potential of directly adverse interests resulting from the fact that GAGE reached a confidential settlement with Enron. For these reasons, Enron has failed to prove that Ward's representation of MAP will be directly adverse to GAGE.

■ 10. The next element is the adequacy of representation. Rule 1.7(a)(1) explicitly requires the lawyer to believe that "representation will not adversely affect the relationship with the other client." This belief must be reasonable too. The Comments reveal the purpose and operation of this element:

> However, as indicated in paragraph (a)(1) with respect to representation directly adverse to a client, and paragraph (b)(1) with respect to material limitations on representation of a client, when a disinterested lawyer would conclude that the client should not agree to the representation under the circumstances, the lawyer involved cannot properly ask for such agreement or provide representation on the basis of the client's consent.

The Code counterpart to Model Rule 1.7 is DR 5–105. Under the Code, the courts required the attorney to show that each client's interest could be adequately represented and that there was no conflict in loyalties which would prevent the exercise of independent judgment for each client. *Fisons Corp. v. Atochem North America, Inc.*, No. 90–1080 (S.D.N.Y. Nov. 14, 1990) (1990 WL 180551, 1990 U.S.Dist. LEXIS 15284). Factors to consider under this element are:

> the nature of the litigation; the type of information to which the lawyer may have had access; whether the client is in a position to protect his interests or know whether he will be vulnerable to disadvantage as a result of the multiple representation; the questions in dispute (e.g., statutory construction versus disputes over facts) and whether a government body is involved.

*Unified Sewerage Agency, Etc. v. Jelco Inc.*, 646 F.2d 1339, 1351 (9th Cir.1981).

■ 11. Ward testified that he believed there were no conflicts of interest which would prevent him from adequately representing MAP and GAGE in the separate proceedings. Ward said he had researched and spoken to the other two attorneys, Winters and Gardenhire, in regards to his representation and the potential for conflict. The circumstances previously dis-

cussed do not show Ward's belief to be unreasonable. While the concurrent representation involves related litigation, it is assured that the interests of Hall and MAP will be adequately protected by the roles played by the additional two counsel, Winters and Gardenhire.

■ 12. The final element is consent of the clients. To be effective, consent must be informed, and this occurs only after full and effective disclosure of all relevant facts has been made. *Manoir–Electroalloys Corp. v. Amalloy Corp.*, 711 F.Supp. 188, 195 (D.N.J.1989). Disclosure and consent in a concurrent representation setting has been discussed by the Ninth Circuit:

> To satisfy the requirement of full disclosure by a lawyer before undertaking to represent two conflicting interests, it is not sufficient that both parties be informed of the fact that the lawyer is undertaking to represent both of them, but he must explain to them the nature of the conflict of interest in such detail so that they can understand the reasons why it may be desirable for each to [withhold consent].

*Unified Sewerage Agency, Etc. v. Jelco Inc.*, 646 F.2d at 1345–46; see also *Florida Ins. Guar. Ass'n., Inc. v. Carey Canada*, 749 F.Supp. 255, 259 (S.D.Fla.1990).

13. Enron challenges the sufficiency of Ward's disclosure. From all of the facts and circumstances, the court concludes that Ward fully disclosed the nature of the conflict and any reasons for why his concurrent representation could be detrimental. First, Hall and his entities were cognizant of the role Ward had played throughout the Plant project. Ward explained that his involvement could make him a potential witness. Ward also fully inquired of Hall's feelings and intentions of any suit against GAGE. At the hearing, Hall displayed a reasonable understanding of the legal ramifications from his decision not to sue GAGE. The court is satisfied that Hall's consent was informed.

## WITNESS

■ 14. Enron also seeks disqualification of Ward on the basis he would be a necessary witness for Enron in the trial of this case. Model Rule 3.7(a) addresses the situation of an advocate also serving as a witness:

> (a) A lawyer shall not act as advocate at a trial in which the lawyer is likely to be a necessary witness except where:
>
> (1) the testimony relates to an uncontested issue;
>
> (2) the testimony relates to the nature and value of legal services rendered in the case; or
>
> (3) disqualification of the lawyer would work substantial hardship on the client.

One of the strongest rationales for this lawyer-witness rule is to prevent jury confusion over the separate roles of an advocate and a witness. This rationale is explained in the comments to Model Rule 3.7:

> Combining the roles of advocate and witness can prejudice the opposing party and can involve a conflict of interest between the lawyer and client.
>
> The opposing party has proper objection where the combination of roles may prejudice that party's right in the litigation. A witness is required to testify on the basis of personal knowledge, while an advocate is expected to explain and comment on evidence given by others. It may not be clear whether a statement by an advocate-witness should be taken as proof or as an analysis of the proof.
>
> . . . .
>
> Apart from these two exceptions, paragraph (a)(3) recognizes that a balancing is required between the interests of the client and those of the opposing party. Whether the opposing party is likely to suffer prejudice depends on the nature of the case, the importance and probable tenor of the lawyer's testimony, and the probability that the lawyer's testimony will conflict with that of other witnesses. . . .
>
> Whether the combination of roles involves an improper conflict of interest with respect to the client is determined by Rule 1.7 or 1.9. For example, if there is likely to be substantial conflict between the testimony of the client and

that of the lawyer or a member of the lawyer's firm, the representation is improper. The problem can arise whether the lawyer is called as witness on behalf of the client or is called by the opposing party.

Rule 3.7(a) eliminates some of the confusion created by the Code counterparts 5–101(B) and 5–102(A). Rule 3.7(a) places a higher standard of proof on the movant—"likely to be a necessary witness." The court is given the discretion to suspend its ruling until a determination is made if another witness could testify to those same matters. Finally, disqualification is not required if the testimony would be merely cumulative. *Cannon Airways v. Franklin Holdings Corp.,* 669 F.Supp. 96, 100 (D.Del.1987).

15. A threshold issue is the timing of the motion. Judge Saffels has held that an attorney who may eventually be affected by Rule 3.7(a) at trial may still participate in pretrial proceedings. *Brown Mackie College v. Graham,* No. 88–2220–S (D.Kan. Apr. 25, 1989) (1989 WL 48478, 1989 U.S. Dist. LEXIS 5055). The record here reflects that discovery is for the most part complete and the parties were in the process of completing a final pretrial order when it was agreed to stay those matters until the CEI bankruptcy had been resolved. The court considers Enron's motion to disqualify to be timely.

■ 16. In considering the necessity of the testimony, the court takes into account such factors as the significance of issues to be addressed in the testimony, the weight of the testimony, and the availability of other evidence to prove the same point. *Paretti v. Cavalier Label Co., Inc.,* 722 F.Supp. 985, 986 (S.D.N.Y.1989). In *Paretti,* the court summarized the general rules where an attorney may be a witness as a result of his earlier role as a negotiator or drafter:

Similarly, a lawyer who merely observed the negotiations and reviewed draft agreements need not be disqualified. *American Special Risk Ins. Co. v. Delta Am. Re Ins. Co.,* 634 F.Supp. 112, 122 (S.D.N.Y.1986). However, when a lawyer drafts an ambiguous document for a layperson, the lawyer may be the only witness capable of explaining what a clause means or why it appears. In that circumstance, the lawyer ought to testify on behalf of this client. See *In re Will of Bartoli,* 137 Misc.2d 499, 501, 521 N.Y.S.2d 392, 294 (Surr.Ct. Nassau County 1987), *aff'd mem.,* 143 A.D.2d 830, 533 N.Y.S.2d 324 (2d Dep't 1988). In a more extreme example, if a lawyer negotiates, executes and administers a contract, and is the key witness at trial, then he must be disqualified. *Acme Analgesics, Ltd. v. Lemmon Co.,* 602 F.Supp. 306 (S.D.N.Y.1985) (Weinfeld, J.).

722 F.Supp. at 986. The court found in *Paretti* that the attorney was not a necessary witness as his recollection of the meeting did not conflict with that of movant's corporate counsel; as his involvement in drawing up early drafts of agreements was not important because the agreements were redrafted; as it was not shown that any of the key terms were actually written by that attorney and, therefore, reflect his understanding of the transaction; and as to any ambiguous terms the testimony of the parties concerning their intent was the best evidence.

■ 17. Enron contends Ward is a necessary witness because he brings a unique perspective to the meetings that he attended, and his personal "recollections and testimony are not available from any other source." [2] Enron wants Ward to testify on his role in drafting the proposed construction and operating agreement and the proposed letters of intent between Enron and the Bradshaw gas producers.[3]

---

**2.** Enron has not shown that Ward would testify to events or representations made during the meetings that no one else has recalled. The fact that Ward first represented MAP in the negotiations and then GAGE in later negotiations is definitely a unique perspective, but does this add anything material to other testimony on what occurred at the meetings or on what positions were taken during the negotiations?

**3.** Neither of these documents were ever executed or used. Enron believes both documents are relevant, nonetheless, since they evidence the understanding and intent at the time of

Contrary to Enron's earlier assertion, Ward did not testify at the hearing that Enron did not force itself into the project with MAP and GAGE and that MAP simply elected to include Enron as a equity participant. At best, Ward agreed that Hall made certain statements at the meeting in July of 1986 between representatives of GAGE, Enron and MAP. Enron did not show that Hall would deny making those statements or that Ward had any other knowledge of whether Enron actually forced itself into the deal. Finally, Enron argues that Ward will be the only witness lacking some association with Enron who would corroborate its defenses of failure of conditions precedent and termination of the assignment and agreement in December of 1986. Ward testified at the hearing that his understanding of whether Enron had reached any agreements or commitments with the Bradshaw producers was simply a matter of what he was told by Enron representatives at that time. At most, Ward would be a hearsay source for the same testimony that Enron's own witnesses will give. In this sense, Ward's testimony would be merely cumulative. Enron has not shown that Ward will likely be a necessary witness.

■ 18. Even assuming Enron had shown that Ward would be a necessary witness, the court finds that MAP has shown his disqualification would work a substantial hardship to it. None of MAP's other attorneys is in a position to accept the responsibility of lead counsel. MAP does not have the financial means to retain counsel except on a contingency basis. The sheer volume of discovery conducted in this case and the complexity of the facts and legal issues pose an immense barrier of finding an attorney of substantial experience who would accept at this point in the proceedings the financial risk of preparing to try it on a contingency basis. Furthermore, with the recent dismissal of CEI's bankruptcy case, this court expects the parties will promptly proceed with completing the pretrial order so that an early trial setting can be given to these cases which are some of the oldest on this court's docket. Under these circumstances, MAP's opportunity and chances of finding experienced lead counsel appear severely limited.

19. Where the party seeking disqualification is also the one wanting to call the attorney as a witness, the court "must be especially sensitive to the potential for abuse." *Federal Deposit Ins. Corp. v. Frazier*, 637 F.Supp. at 81. The likelihood of abuse in this case appears very real. Even though Enron was completely aware of Ward's involvement in the project and negotiations, it never took Ward's deposition nor sought to disqualify Ward while he served as counsel for GAGE. Shortly after Ward entered his appearance for Hall and his entities in this case, UCC filed suit for the first time against GAGE, and a few months later Enron took Ward's deposition. Apparently, UCC has settled any suit with Enron, and Enron presently owns or controls the Plant. UCC's attorney also told Miller of GAGE that the suit against GAGE was filed in part because of a belief that GAGE was subsidizing MAP's lawsuit in this court. Because of these facts, the movant's allegations, assertions and evidence have been carefully scrutinized and found to be lacking the substance that would demand Ward's disqualification.

IT IS THEREFORE ORDERED that Enron's motion to disqualify Stanley M. Ward (Dk. 508) as counsel for Jimmy G. Hall and his entities is denied.

---

Enron as well as GAGE. Presumably, Ward drafted the proposed documents to include those terms which would be consistent with the wishes of Enron. More importantly, the documents speak for themselves. The testimony elicited from Ward at the hearing added nothing to the documents and, in fact, may even have detracted from whatever evidentiary value the documents may have for Enron.