CARNEGIE COMPANIES, INC., Appellee,

v.

SUMMIT PROPERTIES, INC., et al., Appellants.

[Cite as *Carnegie Cos., Inc. v. Summit Properties, Inc.,* 183 Ohio App.3d 770, 2009-Ohio-4655.]

Court of Appeals of Ohio,
Ninth District, Summit County.

No. 24553.

Decided Sept. 9, 2009.

772

Steven J. Miller and Deborah J. Michelson, for appellee.

Marvin L. Karp, for appellants.

DICKINSON, Judge.

## INTRODUCTION

{¶ 1} After a land deal went south, the would-be buyer, Carnegie Companies, Inc., sued the would-be seller, Summit Properties Ltd., seeking return of its

deposit. Summit responded with counterclaims, including one for fraud. Carnegie later moved to disqualify the law firm representing Summit because, according to Carnegie, that firm was representing Carnegie in an unrelated transaction. After a hearing, the trial court granted the motion, disqualifying the firm and determining that Carnegie was entitled to an award of attorney fees and expenses associated with the motion. The trial court indicated that it would schedule a hearing to determine the amount of the award. Summit has appealed, arguing that the trial court incorrectly disqualified its lawyers and incorrectly determined that the lawyers' conduct amounted to bad faith allowing an award of attorney fees and costs. This court does not have jurisdiction to consider the merits of Summit's appeal regarding an award of attorney fees and costs for the motion because that part of the judgment entry was not a final, appealable order. This court affirms the trial court's disqualification of the law firm of Ulmer & Berne, L.L.P. because the firm's simultaneous representation of two clients with directly adverse interests violates Prof.Cond.R. 1.7.

## BACKGROUND

{¶ 2} In August 2007, Carnegie became interested in buying an office building in Twinsburg, Ohio, from Summit. Toward that end, Carnegie's President, Paul Pesses, began negotiating directly with Summit's lawyer, Stuart Laven, of the law firm of Ulmer & Berne, L.L.P. The parties entered into a contract and, consistent with that contract, Carnegie deposited $50,000 in earnest money with an escrow company. Later, Carnegie rescinded the contract and sought return of the earnest money. Summit refused to release the escrowed funds, and, in February 2008, Carnegie sued Summit, seeking a declaratory judgment that Summit had breached the purchase agreement and that Carnegie was entitled to return of its deposit.

{¶ 3} Summit answered the complaint and counterclaimed for breach of contract and fraud in the inducement. Summit claimed that it entered the agreement based on Carnegie's misrepresentation that the offer was not contingent on financing, but Carnegie later backed out of the deal due to difficulty securing financing. Summit sought the $50,000 deposit, reimbursement of all fees and expenses, lost profits, and exemplary damages. Summit was represented in the litigation by Stuart Laven of Ulmer & Berne.

{¶ 4} In July 2008, Carnegie moved the trial court to disqualify Ulmer & Berne from representing Summit in this matter. Carnegie argued that it was a client of Ulmer & Berne at the time the litigation began and, therefore, lawyers from that firm could not ethically represent its opponent in this litigation without its consent. Specifically, Carnegie argued that Ulmer & Berne attorney Robert J.

Karl, of the Columbus office, was representing it in an unrelated matter regarding its contemplated acquisition of property in Marietta, Ohio.

{¶ 5} At the hearing on the disqualification motion, Karl testified that when he was contacted by Fred Scalese of Carnegie in June 2007 to do some environmental work in connection with the Marietta property, he considered Carnegie an existing Ulmer & Berne client. He remembered working for Carnegie on a matter involving a subpoena from the Environmental Protection Agency beginning in the fall of 2004 and concluding in late 2005 or early 2006.

{¶ 6} In June 2007, after receiving an e-mail from Scalese regarding environmental concerns at the Marietta property, Karl invited Scalese to send him the relevant documents. Both sides agree that Carnegie representatives asked Karl whether they would need to report to the Ohio EPA the release of chemicals by a former dry cleaner at the Marietta property. Both sides also agree that Karl discussed that topic with Scalese and Pesses by telephone on June 21, 2007. According to Karl, he was unable to advise Carnegie at that time due to incomplete information. Karl admitted that he did not complete a conflict check or go through his firm's procedure for opening a new file in June 2007. He testified that he asked Carnegie if he could "open up a new matter" for billing purposes and Carnegie officials told him not to because they were just preliminarily looking at buying the Marietta property. Karl claimed that, when he finished the phone call, he "believed [he] was done * * * with this matter," and he did not anticipate any additional follow-up.

{¶ 7} According to Carnegie officials, Karl advised them on June 21, 2007, to ask the seller for more detailed testing of the soil quality at the Marietta property. Scalese testified that at the end of the call, Karl told him to send the additional information to him when it became available. Despite this discrepancy, both sides agree that Karl never sent Carnegie an engagement or termination letter limiting the scope or timing of Ulmer & Berne's representation of Carnegie and Ulmer & Berne's bill for that telephone call did not in any way suggest it was a final bill. Scalese did not contact Karl again until early February 2008.

{¶ 8} Attorney Stuart Laven, of Ulmer & Berne's Cleveland office, testified that he had worked as outside counsel for Summit since 1974. He admitted that he did not complete a conflict check when he began representing it against Carnegie in the Twinsburg transaction in August 2007. In December 2007, after Carnegie rescinded the Twinsburg deal, Laven ran a conflict check and learned that Ulmer & Berne lawyers had represented Carnegie in the past. He sent an e-mail to Karl in the Columbus office and several other Ulmer & Berne lawyers to ask whether anyone was currently representing Carnegie.

{¶ 9} Karl testified that his response to Laven was that he had done "[n]othing" for Carnegie "since [he] spoke with [its representatives] late spring on a

legal matter." Karl said that he spoke directly to Laven the same day and explained the extent of his involvement with Carnegie. According to Laven, he determined that Carnegie was not a current client of the firm and, therefore, that the firm had no conflict of interest in representing Summit against Carnegie in the Twinsburg dispute. He did not, however, open a file for the Twinsburg case in December 2007. Rather, he did not open a file on the Twinsburg dispute until early March 2008, when he received a courtesy copy of Carnegie's complaint against Summit.

{¶ 10} In the meantime, Laven was in contact with attorney Michael Goler who represented Carnegie in the Twinsburg case. Laven admitted that, in January 2008, Goler told him that Ulmer & Berne must withdraw from representing Summit in the matter due to a conflict of interest. Laven admitted that he discussed the matter several times with Goler, both before and after the complaint was filed against Summit, but he continued to refuse to withdraw, citing Goler's lack of detailed information on the conflict. According to Goler, he negotiated with Laven regarding the conflict of interest and finally filed the motion to disqualify after receiving from Laven a definitive refusal to withdraw.

{¶ 11} Meanwhile, Scalese contacted Karl in early February 2008 and arranged to send him a disk containing additional testing data from the Marietta site. Scalese testified that he knew nothing of the Twinsburg transaction because he was never a part of that project. By February, Karl had apparently forgotten the conversation he had had with Laven in December regarding the conflict check for Carnegie. He completed a conflict check for the names of Carnegie's opponents in the Marietta deal, but did not include Carnegie and its affiliates' names. Karl testified that it is not his habit to run a check on the client's name when he has previously done work for that client. He opened a new file and generated a new business report indicating that he began working on the Marietta matter on March 1, 2008. He admitted that he started reviewing Carnegie's documents by, at the latest, March 3, 2008.

{¶ 12} As it happened, Laven opened a new Summit file for the lawsuit filed by Carnegie within days of when Karl opened his file on behalf of Carnegie. On March 11, 2008, after the two new business reports were circulated at Ulmer & Berne, Karl and Laven discussed the issue of a conflict of interest. According to Laven, there was no conflict at that time because Karl had not yet "undertaken the representation" of Carnegie on the Marietta deal "in any meaningful way." Laven testified that when he spoke with Karl in March, Karl assured him there was no problem because he had already recognized the conflict and asked Carnegie for a waiver.

{¶ 13} According to Karl, at the time that he recognized the conflict of interest in March, he had just begun to look at the new testing data and had not had any further discussions with Carnegie representatives since receiving it. He did

admit, though, that in February, he accepted, via e-mail, some additional testing materials sent by the seller of the Marietta property and addressed to him in his capacity as Carnegie's lawyer. Contrary to Laven's testimony, Karl testified that he did not stop working on the Marietta matter and begin trying to obtain a waiver of the conflict from Carnegie until after he spoke with Laven in March. Karl testified that, after several attempts to contact Pesses, he left a voice-mail for him in April, asking whether he would prefer to sign a waiver of the conflict or have Karl return the testing materials and cease to represent Carnegie on the Marietta deal. A few days later, Pesses left a voice-mail for Karl telling him to keep the file and expressing the hope that everything would work out.

{¶ 14} Pesses testified that in June 2007, when he participated in the conference call regarding the environmental question at the Marietta site, he understood Karl to say that he could not advise them until he received additional test results from the seller. According to Pesses, when the updated materials arrived in late January 2008, he asked Scalese to forward them to Karl for analysis. Pesses was not clear about when he first realized that Ulmer & Berne was representing Carnegie in the Marietta transaction and opposing it in the Twinsburg transaction. He stated, however, that he did not object to the apparent conflict until Ulmer & Berne sued Carnegie, accusing it of fraud in the Twinsburg deal. On April 9, 2008, less than two weeks after Laven filed Summit's counterclaim against Carnegie, Carnegie's lawyer sent Laven a letter indicating that Carnegie would not waive the conflict and requesting Ulmer & Berne's withdrawal from the lawsuit.

{¶ 15} After a hearing, the trial court granted the motion to disqualify Ulmer & Berne. It determined that "[a] continuing attorney-client relationship [between Carnegie and Ulmer & Berne] came into existence as to the [Marietta] matter in June 2007 and was never effectively terminated." Therefore, Laven was not able to represent Summit in the Twinsburg matter against Carnegie without full disclosure and a waiver from both clients. The trial court also held that "no effective waiver of the conflict occurred, [actual or implied,] under either present or prior law." The trial court held that Ulmer & Berne's conduct, especially after its lawyers admittedly became aware of the problem, was "dismaying" and amounted to bad faith for which Ulmer must be held accountable. The trial court determined that "Carnegie is entitled to an award of attorney fees and expenses, based upon the finding of bad faith," but indicated that the amount of the award would be determined at a separate hearing. Summit appealed the trial court's decision before that hearing was held.

## FINAL, APPEALABLE ORDER

{¶ 16} This court must address the threshold question of jurisdiction before considering the merits of this appeal. Section 3(B)(2), Article IV of the Ohio

Constitution provides that courts of appeals "shall have such jurisdiction as may be provided by law to review * * * judgments or final orders." An order is final under R.C. 2505.02(B)(4) if it satisfies a three-prong test: "(1) the order must either grant or deny * * * a 'provisional remedy,' (2) the order must both determine the action with respect to the provisional remedy and prevent a judgment in favor of the appealing party with respect to the provisional remedy, and (3) the reviewing court must decide that the party appealing from the order would not be afforded a meaningful or effective remedy by an appeal following final judgment as to all proceedings, issues, claims, and parties in the action." *State v. Muncie* (2001), 91 Ohio St.3d 440, 446, 746 N.E.2d 1092, quoting R.C. 2505.02(B)(4). The statute defines a "[p]rovisional remedy" as "a proceeding ancillary to an action." R.C. 2505.02(A)(3).

{¶ 17} The Ohio Supreme Court has held that "[t]he granting of a motion to disqualify counsel in a civil action is a final, appealable order [under] R.C. 2505.02." *Russell v. Mercy Hosp.* (1984), 15 Ohio St.3d 37, 15 OBR 136, 472 N.E.2d 695, syllabus. Therefore, this court has jurisdiction to consider the trial court's disqualification of Summit's lawyers at Ulmer & Berne. The question is whether this court has jurisdiction to consider Summit's second assignment of error regarding the trial court's determination that Carnegie should be reimbursed for its reasonable attorney fees and expenses related to the motion based on its finding that Ulmer & Berne's conduct amounted to bad faith.

{¶ 18} A trial court may award attorney fees after finding that a party acted in bad faith. *State ex rel. Crockett v. Robinson* (1981), 67 Ohio St.2d 363, 369, 21 O.O.3d 228, 423 N.E.2d 1099. Although a motion for sanctions may create a proceeding ancillary to an action, a sanctions award will not pass the provisional remedy test without an award of a specific amount that is immediately payable. See, e.g., *Dillon v. Big Trees, Inc.*, 9th Dist. No. 23831, 2008-Ohio-3264, 2008 WL 2583032, at ¶ 11. An order is not final until the trial court rules on all of the issues surrounding the award, "leaving nothing outstanding for future determination." Id., citing *State v. Muncie*, 91 Ohio St.3d at 446, 746 N.E.2d 1092.

{¶ 19} In this case, the trial court left the amount of the sanction to be determined at a later date. The trial court granted the motion to disqualify Ulmer & Berne and "determine[d] that Carnegie is entitled to an award of attorney fees and expenses, based upon the finding of bad faith." The trial court indicated that "[a] hearing on the amount of such award [would] be set by separate order." The journal entry appealed from in this case did not include the amount of the sanction, but stated that a hearing would be scheduled to make that determination. Summit filed its notice of appeal before the hearing took place. The journal entry is similar to a finding of liability without a damages award. In the absence of a dollar figure, the sanctions order does not pass the

provisional remedy test and does not constitute a final, appealable order. See R.C. 2505.02(B)(4). Therefore, this court is without jurisdiction to consider the merits of Summit's second assignment of error.

## ATTORNEY DISQUALIFICATION

{¶ 20} Summit's first assignment of error is that the trial court incorrectly disqualified Laven and Ulmer & Berne from representing it in this matter. The Ohio Supreme Court has held that "[a] trial court has the 'inherent power to regulate the practice before it and protect the integrity of its proceedings' including the 'authority and duty to see to the ethical conduct of attorneys* * *.'" *Mentor Lagoons Inc. v. Rubin* (1987), 31 Ohio St.3d 256, 259, 31 OBR 459, 510 N.E.2d 379, quoting *Royal Indemn. Co. v. J.C. Penney Co.* (1986), 27 Ohio St.3d 31, 33–34, 27 OBR 447, 501 N.E.2d 617. "This includes the inherent authority of dismissal or disqualification from a case if an attorney cannot, or will not, comply with [Ohio's rules governing ethics and professionalism] when representing a client." Id. The Supreme Court has emphasized that this power of the trial court "is distinct from the exclusive authority of the Supreme Court of Ohio over attorney disciplinary proceedings, and does not conflict with such power." Id., citing *Royal Indemn. Co.*, 27 Ohio St.3d at 34, 27 OBR 447, 501 N.E.2d 617 (noting that a trial court's revocation of pro hac vice admission is a "separate and distinct method of addressing attorney misconduct" that is in no way dependent on disciplinary proceedings of the Ohio Supreme Court based on the same misconduct); see also Section 2(B)(1)(g), Article IV, Ohio Constitution; Gov.Bar R. V.

{¶ 21} In February 2007, Ohio adopted the Rules of Professional Conduct to replace the Ohio Code of Professional Responsibility. Prof.Cond.R. 1.7 addresses conflicts of interest involving current clients. Under the new rule, "[a] lawyer's acceptance or continuation of representation of a client creates a conflict of interest if * * * the representation of that client will be directly adverse to another current client * * * [or] there is a substantial risk that the lawyer's ability to consider, recommend, or carry out an appropriate course of action for that client will be materially limited by the lawyer's responsibilities to another client, a former client, or a third person or by the lawyer's own personal interests." Prof.Cond.R. 1.7(a). The rule further provides that "[a] lawyer shall not accept or continue the representation of a client if a conflict of interest would be created pursuant to division (a) of this rule, unless all of the following apply: (1) the lawyer will be able to provide competent and diligent representation to each affected client; (2) each affected client gives *informed consent, confirmed in writing*; (3) the representation is not precluded by division (c) of this rule." (Emphasis added.) Prof.Cond.R. 1.7(b). Subpart (c) of Prof.Cond.R. 1.7 de-

scribes situations that prevent a lawyer from continuing to represent both clients when a conflict of interest exists, even if both clients have given their informed consent. Official Comment 2 to Prof.Cond.R. 1.7 provides a roadmap of the five-step analysis required by the rule. "[A] lawyer must: (1) clearly identify the client or clients; (2) determine whether a conflict of interest exists; (3) decide whether the representation is barred by either criteria of division (c); (4) evaluate, under division (b)(1), whether the lawyer can competently and diligently represent all clients affected by the conflict of interest; and (5) if representation is otherwise permissible, consult with the clients affected by the conflict and obtain the informed consent of each of them, confirmed in writing."

## CURRENT CLIENTS

{¶ 22} The first step in the analysis under Prof.Cond.R. 1.7 is to identify the clients. Prof.Cond.R. 1.7, Comment 2. In this case, the clients' identities are clear, but Carnegie's status with Ulmer & Berne is disputed. The trial court determined that Karl formed an attorney-client relationship with Carnegie regarding the Marietta property in June 2007 and that he failed to effectively terminate that relationship. Summit has argued that Carnegie was not a current client, but a former client, when Ulmer & Berne undertook to represent Summit against Carnegie in the Twinsburg matter. The distinction is important because Prof.Cond.R. 1.7 applies only to conflicts of interest involving current clients. Conflicts created by relationships with former clients are governed by Prof. Cond.R. 1.9.

{¶ 23} The new rules do not define "current client" as that term is used in Prof.Cond.R. 1.7. Official Comment 9 to Prof.Cond.R. 1.7, however, provides some guidance. "[P]rinciples of substantive law outside these rules determine whether a client-lawyer relationship exists or is continuing." The official comment also requires consideration of other rules, including Prof.Cond.R. 1.2(c), which allows a lawyer to "limit the scope of a new or existing representation if the limitation is *reasonable* under the circumstances and communicated to the client, preferably in *writing*." (Emphasis added.)

{¶ 24} The Ohio Supreme Court has held that "an attorney-client relationship need not be formed by an express written contract or by the full payment of a retainer." *Cuyahoga Cty. Bar Assn. v. Hardiman*, 100 Ohio St.3d 260, 2003-Ohio-5596, 798 N.E.2d 369, at ¶ 8. "Instead, * * * an attorney-client relationship may be created by implication based upon the conduct of the parties and the reasonable expectations of the person seeking representation." Id.

{¶ 25} Summit has argued that Carnegie was not a current client of Ulmer & Berne when the Twinsburg matter began because Karl did not believe that an

attorney-client relationship had been formed between him and Carnegie in June 2007. According to Karl, he merely completed a discrete project for Carnegie and anticipated no further contact on the matter. The trial court specifically noted that it did not believe Karl's testimony on this point.

{¶ 26} Scalese, of Carnegie, testified that Carnegie had used Ulmer & Berne for all of its environmental issues and various other miscellaneous concerns since 1994. In fact, Karl testified that when he was contacted by Scalese in June 2007, he considered Carnegie an Ulmer & Berne client, despite the nearly two-year break since his last project for it. Scalese testified that when the June 21, 2007 telephone conference ended, he believed that he had been advised to ask the seller for further testing and forward the results to Karl. Although Scalese did not tell Karl that he expected him to represent the company until the Marietta environmental issue was fully resolved, he testified that that idea was "certainly implied." The trial court found this testimony "clearly persuasive." Karl did not send Carnegie any correspondence after this telephone contact to terminate or limit the representation in any way. See Prof.Cond.R. 1.2(c).

{¶ 27} According to Summit's brief, when Carnegie officials contacted Karl in early 2008, Karl treated his additional involvement with the Marietta project as a "new" business matter because this was the "first time" Carnegie had "authorized [him] to run a conflicts check and open a new file." Karl's testimony at the hearing also seems to reflect a mistaken belief that it is the lawyer's expectations that determine whether an attorney-client relationship exits.

{¶ 28} The law does not look to the reasonable expectations of the lawyer in order to determine whether an attorney-client relationship has been established by implication. The law focuses on the "reasonable expectations of the person seeking representation." *Hardiman,* 100 Ohio St.3d 260, 2003-Ohio-5596, 798 N.E.2d 369, at ¶ 8. Following the telephone conference of June 21, 2007, Scalese reasonably believed that Karl was representing Carnegie's interests in the Marietta deal. Nobody at Ulmer & Berne did anything to dispel that belief between June 2007 and the time Scalese sent Karl the updated test results in February 2008. At that time, Karl welcomed the new information and undertook a review of the materials, at least until Laven told him to stop unless he could obtain a waiver.

{¶ 29} To the extent that Summit has challenged the trial court's factual determination that Carnegie was Ulmer & Berne's current client when it undertook to represent Summit in this matter, this court must apply the civil-manifest-weight-of-the-evidence standard of review. See *State v. Wilson,* 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264, at ¶ 24 ("Judgments supported by some competent, credible evidence going to all the essential elements of the case will

not be reversed * * * as being against the manifest weight of the evidence"); but see *Huntington Natl. Bank v. Chappell,* 9th Dist. No. 06CA008979, 2007-Ohio-4344, 2007 WL 2409795, at ¶ 17–75 (Dickinson, J., concurring). The evidence supports the trial court's determination that Ulmer & Berne had an existing attorney-client relationship with Carnegie before Ulmer & Berne got involved in representing Summit against Carnegie in the Twinsburg project. Regardless of whether anyone at Ulmer & Berne ever ran a conflict check or internally opened a new file, the evidence supports the trial court's finding that Karl's actions created an attorney-client relationship with Carnegie in the spring of 2007. See *Hardiman,* 100 Ohio St.3d 260, 2003-Ohio-5596, 798 N.E.2d 369, at ¶ 8. There was also competent, credible evidence supporting the trial court's determination that Ulmer & Berne did nothing to terminate its attorney-client relationship with Carnegie before it undertook to represent Summit against Carnegie in the sale of the Twinsburg property. Thus, this court affirms the trial court's determination that Prof.Cond.R. 1.7 applies to this case. To the extent that Summit's first assignment of error addressed its argument that the trial court applied the wrong rule, it is overruled.

## CONFLICT OF INTEREST

■ {¶ 30} The second step in the analysis under Prof.Cond.R. 1.7 is to determine whether a conflict of interest exists. Prof.Cond.R. 1.7(a)(1) provides that a conflict of interest is created if "the representation of [a] client will be directly adverse to another current client." Comment 10 to Prof.Cond.R. 1.7 provides that "[t]he concurrent representation of clients whose interests are directly adverse always creates a conflict of interest." Comment 11 describes various ways that clients' interests may be directly adverse in litigation. In addition to the situation in which one client asserts claims against another, clients' interests may also be directly adverse when effective representation of one client in a lawsuit requires a lawyer to cross-examine another client, who he represents in a separate matter, but who appears as a witness in a different lawsuit. Comment 13 to Prof.Cond.R. 1.7 addresses directly adverse interests in the transactional setting. Comment 13 provides that absent informed, written consent, a lawyer cannot undertake to represent a seller's interests in negotiations with a buyer whom the lawyer represents in another, unrelated matter.

{¶ 31} Each of these situations either has occurred or is likely to occur at some point in this case. During the negotiation phase, Summit's interests, as the seller of the Twinsburg property, were directly adverse to Carnegie's interests as the buyer. See Prof.Cond.R. 1.7, Comment 13. After Carnegie canceled the deal in December 2007, and certainly at the time it filed its complaint, the interests of the two companies were directly adverse under Prof.Cond.R. 1.7. Additionally, if

Ulmer & Berne is allowed to continue to represent Summit in this matter, at some point, its lawyers will have to cross-examine Carnegie's representatives. See Prof.Cond.R. 1.7, Comment 11.

{¶ 32} The Ohio Rules of Professional Conduct impute conflicts of interest to all lawyers "associated in a *firm*." (Emphasis added.)  Prof.Cond.R. 1.10(a). "While lawyers are associated in a *firm*, none of them shall represent a client when the lawyer *knows* or *reasonably should know* that any one of them practicing alone would be prohibited from doing so by Prof.Cond.R. 1.7 * * *." (Emphasis added.)  Id.  The rules define the term "knows" as having "actual knowledge," but indicate that "[a] person's knowledge may be inferred from circumstances."  Prof.Cond.R. 1.0(g).  "Reasonably should know" means that "a lawyer of reasonable prudence and competence would ascertain the matter in question."  Prof.Cond.R. 1.0(k).  It is not disputed that Laven and Karl were associated in the firm of Ulmer & Berne at all relevant times.  Therefore, if Laven knew or reasonably should have known that Karl could not have represented Summit against Carnegie, then he was also prohibited from doing so.

{¶ 33} The first official comment to Prof.Cond.R. 1.7 provides: "The principles of loyalty and independent judgment are fundamental to the attorney-client relationship and underlie the conflict-of-interest provisions of these rules.  Neither the lawyer's personal interest, the interests of other clients, nor the desires of third persons should be permitted to dilute the lawyer's loyalty to the client." "The rule of imputed disqualification * * * gives effect to the principle of loyalty to the client as it applies to lawyers who practice in a law firm."  Prof.Cond.R. 1.10, Comment 2.  "[F]or purposes of the rules governing loyalty to the client," "a firm of lawyers is essentially one lawyer."  Id.

{¶ 34} The rules charge lawyers with the responsibility of detecting and avoiding potential conflicts of interest.  A large law firm like Ulmer & Berne must adhere to policies and procedures designed to detect potential conflicts of interest that may arise.  When a firm employs hundreds of lawyers in offices located in different cities, it must be particularly cautious in this regard.  The official comment to Prof.Cond.R. 1.7 unequivocally provides that "[i]gnorance caused by a failure to institute or follow" reasonable procedures for detecting potential conflicts of interest "will not excuse a lawyer's violation of [Prof.Cond.R. 1.7]."  Prof.Cond.R. 1.7, Comment 3.

{¶ 35} Ulmer & Berne had many opportunities to avoid this situation.  For instance, Laven could have run a conflict check when Summit first asked him to become involved in the Twinsburg deal.  Laven testified that Ulmer & Berne does not have a rule about when to run a conflict check, and many times he will not run one until a transaction is heading toward litigation.  He also testified that Ulmer & Berne does not have a formal procedure for disclosing to clients when

their representation has terminated. Had Karl sent a termination letter to Carnegie after the June telephone conference, the conflict might have been avoided.

{¶ 36} Even after Laven ran the conflict check in December 2007 and discovered a billing to Carnegie for services recently rendered, he and Karl failed to ascertain that a conflict existed. And Laven failed to open a file for the Twinsburg representation at that time, ensuring that no new business report was circulated to the other lawyers in the firm. Laven testified, in response to questions from the trial court, that Ulmer & Berne's policy allowed the lawyer opening the file to independently determine whether a potential opponent is a "current client" of the firm. See Prof.Cond.R. 1.7. The firm's ethics specialist would not be consulted unless two lawyers disagreed.

{¶ 37} In this case, the two lawyers apparently agreed. According to Laven, when he saw Carnegie's name on the new business report in March 2008, he told Karl to obtain a waiver from Carnegie before going any further. According to Laven, he had undertaken the representation of Summit against Carnegie in December 2007 while Karl had undertaken the representation of Carnegie in early March 2008. Although Laven's new business report was released after Karl's, according to Laven, he was already engrossed in the case and Karl was not.

{¶ 38} Regardless of what the lawyers later claimed to have believed at the time, a reasonable lawyer would have ascertained that there was a conflict of interest, at least by December 2007. The evidence supports the imputation of the conflict to Laven because he either knew or should have known that Karl would be prohibited from representing Summit against Carnegie, making him also unable to represent Summit against Carnegie in this lawsuit. See Prof.Cond.R. 1.10(a).

## VIOLATION OF PROF.COND.R. 1.7

{¶ 39} Under Prof.Cond.R. 1.7(b), a lawyer must decline new representation or discontinue any existing representation that would create a conflict of interest, unless "the lawyer will able to provide competent and diligent representation to each affected client" and "each affected client gives *informed consent, confirmed in writing.*" (Emphasis added.) Carnegie has argued that Ulmer & Berne violated Prof.Cond.R. 1.7 by accepting and refusing to discontinue representation that created a conflict of interest because it lacked written confirmation of informed consent from each affected client.

{¶ 40} Summit has cited this court's decision in *Sarbey v. Natl. City Bank of Akron* (1990), 66 Ohio App.3d 18, 583 N.E.2d 392, in support of its argument that

even if Carnegie was a current client when it sued Summit, a conflict of interest under Prof.Cond.R. 1.7 does not require disqualification if the attorney can show there will be no apparent or actual conflict of loyalties or diminution in the vigor of representation. *Sarbey* was decided before Ohio adopted the Rules of Professional Responsibility, and the opinion does not support Summit's argument.

### Sarbey v. Natl. City Bank of Akron

{¶ 41} Summit's argument relies on language in *Sarbey* that this court took from the Second Circuit case of *Cinema 5 Ltd. v. Cinerama, Inc.* (C.A.2, 1976), 528 F.2d 1384. *Cinema 5* introduced a new test for evaluating the necessity of disqualification in a current client situation. The case involved a lawyer who divided his time between two cities and two law firms. A problem arose when his firm in New York City accepted the representation of a plaintiff wishing to sue a client of his Buffalo, New York law firm. The Second Circuit held that the substantial-relationship test that turns on the level of relatedness between the two controversies "does not set a sufficiently high standard" for evaluating the need for disqualification in a current client situation. Id. at 1387. The court emphasized that if the relationship is continuing, the lawyer "must be prepared to show, at the very least, that there [would] be no actual or apparent conflict in loyalties or diminution in the vigor of his representation." Id.

{¶ 42} The Second Circuit stated "as mildly as [it could]" that under the American Bar Association's Code of Professional Responsibility, "it would be questionable conduct for an attorney to participate in any lawsuit against his own client without the knowledge and consent of all concerned." Id. at 1386. Although the Second Circuit stated that *Cinema 5* did not require it to decide whether concurrent adverse representation, without more, would always require disqualification, it seemed to hold that it would not. Id. at 1387. The court determined, however, that the law firm in that case had failed to meet the "heavy burden" of showing there would be no actual or apparent conflict. Id. The court affirmed the disqualification of the firm based on the importance of a lawyer's duty of undivided loyalty to his client. Id., 528 F.2d at 1386–1387. "Because 'an attorney must avoid not only the fact, but even the appearance, of representing conflicting interests,' this requires * * * disqualification." Id. at 1387, quoting *Edelman v. Levy* (1973), 42 A.D.2d 758, 346 N.Y.S.2d 347, 349. Despite the court's agreement with the district court's finding that "there was no actual wrongdoing" and its desire to avoid any criticism of the lawyers involved, it affirmed the disqualification. Id. at 1385, 1387.

{¶ 43} In *Sarbey,* this court affirmed the trial court's disqualification of an attorney it found was engaged in a conflict of interest and its finding that there was no consent to the dual representation. In that case, this court quoted the

above-quoted language from *Cinema 5* regarding a lawyer engaging in concurrent adverse representation " 'without the knowledge and consent of all concerned.' " Id. at 24, 583 N.E.2d 392, quoting *Cinema 5*, 528 F.2d at 1386. This court also quoted the Second Circuit's description of the "very least" a lawyer must be able to show in order to consider dual representation of current clients: Representation adverse to a current client, as opposed to a former client, is " 'prima facie improper * * * and the attorney must be prepared to show, at the very least, that there will be no actual or *apparent* conflict in loyalties or diminution in the vigor of his representation.' " (Emphasis added.) Id. at 24, 583 N.E.2d 392, quoting *Cinema 5*, 528 F.2d at 1387. Contrary to Summit's argument, however, this court did not hold that concurrent adverse representation is permissible provided the lawyer can make that showing. This court did not evaluate whether the lawyer in *Sarbey* had made such a showing.

{¶ 44} This court's decision in *Sarbey* turned on an analysis of a former Disciplinary Rule, DR 4–101(C), that forbade a lawyer to knowingly reveal a client confidence or use it to the disadvantage of his client. In spite of the lawyer's assertion that there was no possibility that he could violate DR 4–101(C), this court held that he "was engaged in a conflict of interest by undertaking to represent an interest adverse to a present client." Id., 66 Ohio App.3d at 28, 583 N.E.2d 392. This court explained that "[n]ormally, such a determination justifies disqualification of the offending attorney." After disposing of an implied consent argument based on DR 5–105, this court affirmed the trial court's disqualification of the offending lawyer.

## Ohio Federal Law

{¶ 45} Summit has also cited several Ohio federal district court decisions applying the former DR 5–105 to concurrent adverse-representation situations and denying motions to disqualify the lawyers involved. The former DR 5–105 precluded multiple representation "if the exercise of [the lawyer's] independent professional judgment in behalf of a client will be or is likely to be adversely affected by his representation of another client, except to the extent permitted under DR 5–105(C)." DR 5–105(B). The exception allowed a lawyer to represent multiple clients only "if it is obvious that he can adequately represent the interest of each and if each consents to the representation after full disclosure of the possible effect of such representation on the exercise of his independent professional judgment on behalf of each." DR 5–105(C).

{¶ 46} In *Pioneer–Std. Elecs., Inc. v. Cap Gemini Am., Inc.* (Mar. 11, 2002), N.D. No. 1:01CV2185, 2002 WL 553460, at *3, the district court held that a firm's representation of one client against another current client was not a violation of DR 5–105, and, therefore, the analysis never progressed to the exception requir-

ing consent of the parties. The decision was based on the language of DR 5–105 that conditioned a violation on an adverse effect on the lawyer's professional judgment. Id. at *3, fn. 2. Because of that requirement, the court held that DR 5–105 did not present a per se rule against representation adverse to a current client, but only a rebuttable presumption against it. Id. If the lawyer could show that there would be no actual or apparent conflict of loyalties or diminution in the vigor of his representation of either client, then there was no violation of the rule, presumably because the lawyer had shown that "his independent professional judgment in behalf of a client [would not be] or [was unlikely to be] adversely affected by his representation of another client." DR 5–105(B).

### The New Rule

{¶ 47} Prof.Cond.R. 1.7, however, contains two separate and independent ways of creating a conflict of interest involving two current clients. Not only does multiple representation create a conflict of interest if "there is a substantial risk that the lawyer's [abilities for one client] will be materially limited by [his] responsibilities to another client," but a conflict is also created under Prof. Cond.R. 1.7(a)(1) if "the representation of [one] client will be directly adverse to another current client." This significant difference between DR 5–105 and Prof.Cond.R. 1.7 limits the utility of case law decided under DR 5–105 in cases applying Prof.Cond.R. 1.7. The Task Force on the Rules of Professional Conduct, appointed by the Ohio Supreme Court, created a commentary titled "Comparison to former Ohio Code of Professional Responsibility" accompanying each new rule. As the Task Force points out in its comparison of Prof.Cond.R. 1.7, there are "many situations" that require a lawyer to request client consent, "not only those in which an adverse effect on the lawyer's judgment is patent or inevitable, as DR 5–105(B) can be interpreted to state."

{¶ 48} Prof.Cond.R. 1.7 provides that multiple representation creates a conflict of interest if the representation of one client is "directly adverse to another current client." Prof.Cond.R. 1.7(a)(1). In this case, one of Ulmer & Berne's current clients sued another current client, and Ulmer & Berne answered and counterclaimed on behalf of one client against another client. Thus, the trial court correctly held that Ulmer & Berne's representation of the second client in this case created a conflict of interest under Prof.Cond.R. 1.7.

{¶ 49} The only exception to the rule prohibiting a lawyer from "continu[ing] the representation of a client if a conflict of interest would be created" is if "all of the following apply." Prof.Cond.R. 1.7(b). The word "all" refers to a three-prong test. Part one of the test is that "the lawyer will be able to provide competent and diligent representation to each affected client." Prof.Cond.R. 1.7(b)(1). Thus, unless and until the lawyer has determined that he is able to

provide each client "competent and diligent representation," he should not even ask his clients for consent. The second prong is that "each affected client gives *informed consent, confirmed in writing*." (Emphasis added.) Prof.Cond.R. 1.7(b)(2). The final prong is that "the representation is not precluded by division (c) of this rule." Division (c) includes specific nonconsentable conflict situations that are not relevant to this case.

{¶ 50} Prof.Cond.R. 1.7(b) makes it clear, however, that any conflict of interest is nonconsentable if the lawyer cannot first show that he is able to represent both clients competently and diligently. The final two steps of the five-part analysis offered by the Supreme Court in Comment 2 to Prof.Cond.R. 1.7 are to evaluate whether the lawyer can diligently represent both clients and "if representation is otherwise permissible, * * * obtain the informed consent of each of them, confirmed in writing."

{¶ 51} "[A]bsent consent, a lawyer may not act as an advocate in one proceeding against a person the lawyer represents in some other matter, even when the matters are wholly unrelated." *Avon Lake Mun. Util. Dept. v. Pfizenmayer*, 9th Dist. No. 07CA009174, 2008-Ohio-344, 2008 WL 281837, at ¶ 15, quoting Prof.Cond.R. 1.7, Comment 11. In this case, Summit cannot meet the requirements of the three-part exception. See Prof.Cond.R. 1.7(b). Regardless of whether Ulmer & Berne "will be able to provide competent and diligent representation" to both companies, it has admitted that it does not have the informed consent of either company confirmed in writing. Therefore, the trial court correctly held that a conflict of interest exists, and the situation does not fit within the exception to the rule. The trial court correctly determined that Ulmer & Berne violated Prof.Cond.R. 1.7. To the extent that Summit's first assignment of error addresses its argument that Ulmer & Berne did not violate Prof.Cond.R. 1.7, it is overruled.

## IMPACT OF A VIOLATION OF PROF.COND.R. 1.7

{¶ 52} Generally, this court reviews a trial court's ruling on a motion to disqualify counsel for an abuse of discretion. *Pfizenmayer*, 9th Dist. No. 07CA009174, 2008-Ohio-344, 2008 WL 281837, at ¶ 13, citing *Clucas v. Vojtech* (1997), 119 Ohio App.3d 475, 477, 695 N.E.2d 809. "When a court's judgment is based on an [arguably] erroneous interpretation of the law, [however,] an abuse-of-discretion standard is not appropriate." *Med. Mut. of Ohio v. Schlotterer*, 122 Ohio St.3d 181, 2009-Ohio-2496, 909 N.E.2d 1237, at ¶ 13. In this case, this court must determine whether Prof.Cond.R. 1.7 is a per se rule, a violation of which requires disqualification. Summit has argued that, even if Ulmer & Berne violated Prof.Cond.R. 1.7, it cannot be automatically disqualified solely on that basis. According to Summit, this court should follow a recent decision of the

United States District Court for the Northern District of Ohio holding that it would be inappropriate to apply a per se rule requiring disqualification of counsel based on a violation of Prof.Cond.R. 1.7. *Cliffs Sales Co. v. Am. S.S. Co.* (Oct. 4, 2007), N.D. No. 1:07–CV–485, 2007 WL 2907323, at \*5.

{¶ 53} In *Cliffs Sales*, the district court determined that, rather than applying a per se rule to instances of dual representation in violation of Prof.Cond.R. 1.7, as some courts had done, "the better approach is to examine the factual situation to determine if disqualification is necessary." Id. at \*5. The court cited *Pioneer–Std.*, 2002 WL 553460, at \*2, for the proposition that in order to determine "whether disqualification is necessary, [a] court must determine if [the lawyer] can represent adverse clients concurrently with equal vigor, without conflict of loyalties and without using confidential information to the detriment of either client." Id.

{¶ 54} As discussed above, however, the court in *Pioneer–Std.* determined that there was no violation of DR 5–105 because the lawyer overcame the rebuttable presumption against concurrent adverse representation. Id., 2002 WL 553460, at \*3. Therefore, the court in *Pioneer–Std.* did not consider whether a violation of DR 5–105 could be cured by a showing that the lawyer can represent both clients with equal vigor. Rather, the decision in that case turned on whether the firm the moving party sought to disqualify had violated DR 5–105. The court pointed out that Ohio's DR 5–105 differed from the Model DR 5–105 that contained language making it a rule violation to represent clients with differing interests. Id. at \*3, fn. 2. Because representing clients with differing interests alone was not a violation of Ohio's DR 5–105, there was no need to resort to the rule's exception requiring client consent. Id.

{¶ 55} This court declines to follow the reasoning of the district court in *Cliffs Sales*. The idea that concurrent representation is permissible as long as it can be done with "equal vigor" comes from case law decided under former DR 5–105. That DR was materially different from the currently applicable Prof.Cond.R. 1.7. In order to violate DR 5–105, the concurrent representation had to be likely to have an adverse effect on the lawyer's independent professional judgment. DR 5–105(B). Prof.Cond.R. 1.7(a) does not require any adverse effect on the lawyer's judgment. Under the Rules of Professional Conduct, any directly adverse concurrent representation is sufficient to violate the rule regardless of how vigorously the lawyer may be able to represent both clients. Prof.Cond.R. 1.7(a).

{¶ 56} This court is aware of the delicate balance to be struck between the right to proceed with counsel of one's choice and the need to ensure that attorneys act ethically. *Karaman v. Pickrel, Schaeffer & Ebeling Co.*, 2d Dist. No. CA21813, 2008-Ohio-4139, 2008 WL 3583361, ¶ 15, quoting *Spivey v. Bender* (1991), 77 Ohio App.3d 17, 22, 601 N.E.2d 56. A party does not, however,

have an absolute right to be represented by a particular lawyer or law firm. *Internatl. Business Machines Corp. v. Levin* (C.A.3, 1978), 579 F.2d 271, 283. In concurrent-representation situations, the importance of maintaining the "public confidence in the propriety of the conduct of those associated with the administration of justice" outweighs a party's interest in choosing its own lawyer. Id. "The extreme sanction of disqualification should only be utilized when there is a 'reasonable possibility that some specifically identifiable impropriety' actually occurred, and where the public interest in requiring professional conduct by an attorney outweighs the competing interest of allowing a party to retain counsel of his choice." *SST Castings, Inc. v. Amana Appliances, Inc.* (S.D.Ohio 2002), 250 F.Supp.2d 863, 865, quoting *Kitchen v. Aristech Chem.* (S.D.Ohio 1991), 769 F.Supp. 254, 258. It is appropriate for the net of disqualification to be cast at least as wide as that of attorney discipline for conduct that not only violates an ethical rule but also undermines the basic duty of undivided loyalty to one's clients.

{¶ 57} This court holds that a violation of Prof.Cond.R. 1.7 requires disqualification of the offending lawyer. The language of the rule prohibiting concurrent adverse representation is mandatory. "A lawyer shall not accept or continue the representation of a client if a conflict of interest would be created * * * unless all [three prongs of the exception] apply." Prof.Cond.R. 1.7(b). Absent such a showing by the lawyer, the trial court must grant a motion for disqualification. "[A trial] court [must be mindful of] * * * its own ethical duty to intercede when it perceives a violation of [the ethical rules applicable to lawyers]." *Clucas v. Vojtech* (1997), 119 Ohio App.3d 475, 477, 695 N.E.2d 809 (affirming sua sponte disqualification of lawyer representing defendant and third-party defendants in same case).

{¶ 58} Comment 1 to Ohio's Prof.Cond.R. 1.7 begins by emphasizing that "[t]he principles of loyalty and independent judgment are fundamental to the attorney-client relationship and underlie the conflict of interest provisions of these rules." "An attorney who fails to observe his obligation of undivided loyalty to his client injures his profession and demeans it in the eyes of the public." *Internatl. Business,* 579 F.2d at 283. "Because the interest sought to be protected by * * * Prof.Cond.R. 1.7 is one of loyalty [to one's client], a per se rule of disqualification should be applied when that rule is breached." *Manoir-Electroalloys Corp. v. Amalloy Corp.* (D.N.J.1989), 711 F.Supp. 188, 195. To the extent that Summit's first assignment of error addresses the argument that a violation of Prof.Cond.R. 1.7 does not require disqualification of the offending lawyer, it is overruled.

## IMPLIED CONSENT

{¶ 59} Summit has argued that Carnegie forfeited its right to object to Ulmer & Berne's representation of Summit in this matter by waiting too long to assert the objection. Summit has specifically argued that Carnegie forfeited its objection by failing to make it in August 2007, as soon as Pesses started negotiating directly with Laven on the purchase of the Twinsburg property. Carnegie did not file its motion to disqualify Ulmer & Berne until July 2008, more than four months after it filed its complaint. Carnegie has argued that it never forfeited its objection to the dual representation, pointing to various communications indicating that it would not waive the conflict and asking Ulmer & Berne to extricate itself from the Twinsburg case.

{¶ 60} "As a general rule, a former client may be held to have waived the right to object to an attorney's subsequent representation of an adverse interest by failure to timely raise the objection." *Sarbey*, 66 Ohio App.3d at 28, 583 N.E.2d 392. This court has held that "[t]imeliness is not a fixed concept," but "the proper time within which to raise an objection is soon after the onset of litigation * * * or at least within a reasonable time once the facts are known." Id. at 28–29, 583 N.E.2d 392 (pointing out that courts "have varied from finding waiver by failure to object within ten days * * * to finding no waiver despite the passage of three years").

{¶ 61} This court has noted that the concept of implied consent to or waiver of dual representation is rarely applied in situations involving current clients. *Sarbey*, 66 Ohio App.3d at 29, 583 N.E.2d 392. When the doctrine has been applied in current client situations, "there were usually extreme circumstances that justified such action." Id. Because implied waiver is an equitable remedy, it "will not be used to bar a motion to disqualify where no prejudice has resulted from the delay." Id. If the party arguing implied waiver is able to show prejudice resulting from the delay in filing the motion to disqualify, that prejudice "must be further balanced against the serious ethical implications of dual representation, and against the mandates of [the applicable ethical rule]." Id. This court has held that, in dual representation situations, the doctrine of implied consent or waiver should be applied "only where there is substantial proof that the movant's delay has resulted in serious prejudice to the opposing party, or where litigation has proceeded to the point where disqualification would create substantial hardship to the opposing party, or where it is clear that the moving party knowingly delayed the filing of the motion in order to cause such hardship or prejudice." Id. at 29–30, 583 N.E.2d 392.

{¶ 62} In *Sarbey*, this court determined that none of these factors were present. Id. at 30, 583 N.E.2d 392. The opposing party moved to disqualify

nearly three months before trial and before any substantial discovery had been completed. There was no showing of hardship to the party employing the target lawyer, nor was there any evidence that the opposing party moved for disqualification in order to cause prejudice or hardship to its opponent. Id.

{¶ 63} Carnegie has argued that the doctrine of implied consent cannot be applied in any case involving Prof.Cond.R. 1.7(b)(2) because the new rule requires that client consent to dual representation be confirmed in writing. Assuming, without deciding, that the doctrine of implied consent remains a viable concept in a dual-representation case under Prof.Cond.R. 1.7, Summit's argument fails because the record does not support its application in this case. Summit has not argued that it has been prejudiced by Carnegie's delay in filing the motion to disqualify. Summit has also failed to explain to this court how it would suffer a substantial hardship if the court disqualified Ulmer & Berne at this point in the litigation. Finally, the record does not contain any evidence that Carnegie knowingly delayed filing the motion in order to cause Summit some hardship or prejudice. In fact, it seems that Carnegie made several attempts to resolve the problem with Ulmer & Berne directly without court involvement.

{¶ 64} It appears from the record that despite the four-and-a-half-month delay, the parties had not even completed paper discovery when the motion to disqualify Ulmer & Berne became the focal point of the litigation. Carnegie moved to disqualify the firm more than six months before the scheduled trial date. Summit cannot claim to have been surprised to receive the motion, given the discussions its lawyers had been having with Carnegie's lawyers since before the complaint was filed. Laven admitted that Carnegie's lawyer asked him about a conflict of interest as early as January 2008. He also admitted that he received Carnegie's written request for his withdrawal in April 2008, but stated that he responded by claiming no knowledge of a current conflict of interest. He admitted that this exchange took place at least a month after Ulmer & Berne had circulated new business reports showing Carnegie as both a client and opponent of the firm. The trial court correctly refused to apply the doctrine of implied waiver in this case. Summit's first assignment of error is overruled.

## ATTORNEY FEES AND COSTS

{¶ 65} Summit's second assignment of error is that the trial court incorrectly determined that Ulmer & Berne's conduct constituted bad faith and incorrectly granted Carnegie's request for its attorney fees and costs associated with moving to disqualify. As discussed above, this court does not have jurisdiction to consider this assignment of error because the judgment entry awarding attorney fees was not a final, appealable order. Summit's second assignment of error is overruled on that basis.

## CONCLUSION

{¶ 66} Representing two clients with directly adverse interests creates a conflict of interest under Prof.Cond.R. 1.7(a). In order to continue in such multiple representation, the lawyer must be able to meet all three requirements of Prof.Cond.R. 1.7(b). In this case, the record supports the trial court's findings that Carnegie was a current client of Ulmer & Berne when Ulmer & Berne undertook to represent Summit in this lawsuit. Ulmer & Berne cannot show that it fully disclosed the situation and obtained written confirmation of each client's informed consent. Therefore, the trial court correctly granted Carnegie's motion for disqualification. To the extent that it addressed disqualification, the judgment of the Summit County Common Pleas Court is affirmed.

{¶ 67} This court does not have jurisdiction to consider Summit's argument regarding an impending award of attorney fees and costs. That part of Summit's appeal addressing an award of attorney fees and costs is dismissed.

> Judgment affirmed in part
> and appeal dismissed in part.

MOORE, P.J., and WHITMORE, J., concur.